Ronald J. NEMMERS and Sarah L. Nemmers, as Parents and Next Friends of Eric P. Nemmers, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 82–1257.

United States District Court, C.D. Illinois, Peoria Division.

March 3, 1988.

Edward R. Durree, Strodel, Kingery & Durree, Peoria, Ill., for plaintiffs.

Mark D. Stuaan, Former Asst. U.S. Atty., Peoria, Ill., for defendant.

## ORDER

MIHM, District Judge.

This action seeks damages under the Federal Tort Claims Act (FTCA) for injuries sustained as a result of alleged medical malpractice. It is currently before the Court on remand from the Court of Appeals for the Seventh Circuit. *Nemmers v. United States,* 795 F.2d 628 (7th Cir.1986).

The introduction to the Seventh Circuit's decision contains a succinct description of the basic facts alleged and the issues that the Court of Appeals has identified for consideration on remand. That excerpt reads as follows:

Eric Nemmers was born in July 1973, more than three weeks late. His mother had a difficult labor. Her physicians at a Naval hospital told her to go home and stay there until she had regular pains, five minutes apart. They performed no tests and prescribed no medicine other than a suppository. When Mrs. Nemmers called to inquire about intense but irregular pains a nurse told her to stop calling until she had regular pains. After more than two days of irregular pains, Mrs. Nemmers was taken to the Navy hospital, where a physician performed a Caesarean section. Eric survived but is retarded (I.Q. of 45) and has cerebral palsy. The district judge concluded after a bench trial that Eric's problems were caused by negligent medical treatment at and before his birth. 612 F.Supp. 928, 933 (C.D.Ill.1985). The case presents three problems: The statute of limitations, the extent of compensation for a reduction in the ability to enjoy life, and the rate of change of the cost of Eric's care.

*Nemmers v. United States,* 795 F.2d at 629.

The Court will consider the three areas in the same order as they were enumerated by the Appellate Court.

## I. STATUTE OF LIMITATIONS

The Federal Tort Claims Act allows two years within which to file a claim. 28 U.S.C. 2401(b). The time starts to run in a medical malpractice case when the plaintiff has the information necessary to discover "both his injury and its cause." (Citations omitted).

795 F.2d at 629.

The Seventh Circuit in its opinion found that this Court did not correctly analyze the statute of limitations issue and that this Court had merely imposed a subjective analysis to the facts in the case rather than also applying the objective, or "reasonable person" test.

This Court believed that it had properly considered both the subjective and the objective components of analysis regarding the Plaintiffs' failure to recognize the medi-

cal—the "iatrogenic"—causes of Eric's injuries prior to August 21, 1981. Obviously, based on the Appellate Court's decision, this Court was in error in its explanation of its findings.

### A. *Supplemental Findings of Fact*

■ 1. Eric Nemmers was born in July 1973. Plaintiffs (Ronald J. Nemmers and Sarah L. Nemmers) first knew, or in the exercise of reasonable care and reasonable diligence should have known as of August 26, 1981, that Eric Nemmers' cerebral palsy, mental retardation, and related disabilities could potentially have been caused by acts or omissions of the Defendant's physicians at the time surrounding Eric's birth.

August 26, 1981 is the date on which the Plaintiffs read a newspaper article which reported a case very similar to Eric's situation. That article, in the *Peoria Journal Star*, reported the settlement of a child's medical malpractice lawsuit. The article indicated that due to a delayed Caesarean section, the child sustained brain damage as a result of inadequate oxygen. The child described in the article displayed disabilities strikingly similar to those suffered by Eric.

2. Prior to August 26, 1981, the Plaintiffs exercised reasonable diligence in their attempts to determine the cause of Eric's injuries, but neither knew nor should have known that his disabilities could have resulted from acts or omissions of the Defendant's physicians.

3. The record in the case demonstrates that the Plaintiffs made prompt and reasonable inquiry concerning Eric's condition. They were nonetheless not provided with facts or information from which they either knew or in the exercise of reasonable care should have known that Eric's brain damage could have resulted from deprivation of oxygen at the time of birth.

4. Immediately before and after the delivery of their child, Plaintiffs were advised that Eric was, in all respects, a healthy baby. (Vol. 1 at 58–59)[1]. When Eric reached 12 months the Plaintiffs began to suspect irregularities in his development and promptly sought medical attention from their Navy physician. (Vol. 1 at 59–60). Their concerns were allayed by the physician's assurances, until Eric reached the approximate age of 18 months, when Drs. Pretlow and Lockner confirmed that he suffered from cerebral palsy. (Vol. 1 at 52, 63). The Plaintiffs made prompt inquiries of Drs. Pretlow and Lockner as to the cause of Eric's problems. (Vol. 1 at 64, 68). They were told, in effect, that no one knows what causes it or why some children and not others suffer its development. (Vol. 1 at 159). Dr. Lockner, with whom the Plaintiffs developed a very close relationship, characterized Eric's condition as "an act of God." (Vol. 1 at 159). From the date of Eric's birth until the date of his father's discharge from the Navy—a period in excess of three years—no Navy physician advised of or alluded to a possible connection between Eric's cerebral palsy and the treatment provided to Mrs. Nemmers during her labor and delivery. (Vol. 1 at 68–69). To the contrary, in response to their specific inquiries, the Plaintiffs were told by physicians on whom they relied that the cause was not determinable. (Vol. 1 at 64, 68, 159).

5. The Court's finding with regard to the Plaintiffs' lack of actual or implied knowledge is not altered by the letter received by the Plaintiffs in June, 1977 from Dr. Stephen Copps of the Gundersen Clinic. Dr. Copps' report would not cause a reasonable person to conclude, or even suspect, that Eric may have been injured as a result of conduct of the Defendant's medical personnel, or that the timing of his mother's Caesarean section had anything to do with his cerebral palsy.

■ Dr. Copps' report specifically states that the exact reason for Eric's "mild brain damage" could not be explained. His discussion on causation focused on the illness suffered by Mrs. Nemmers early in her pregnancy as a "possible cause." He makes no such statement with respect to the circumstances of Eric's birth or delivery. For ordinary people, exercising rea-

---

**1.** Volume references are to the original trial of this matter held in 1985.

sonable care and diligence, Dr. Copps' use of such words as "trauma of birth" or "fetal distress during labor" are at best ambiguous. They do not denote terms which would infer to a reasonable man (or woman) that acts or omissions of government physicians could have been, somehow, causes of the child's brain damage. Further, the report sets forth in detail Dr. Copps' opinion that Eric did not have the specific types of problems and limitations which are found in children who suffer cerebral palsy resulting from brain damage that occurs just before, at, or after birth, or from a lack of oxygen to the brain. Lastly, Dr. Copps describes Eric's condition as one of "minimal brain damage," which was clearly incorrect.

6. The government has placed great weight on the supposition of Dr. Copps that there was a possibility that "... relatively severe influenza-like high fever at about the third month of your pregnancy" could have affected the developing embryo. Defendant argues that Mrs. Nemmers, knowing that she had only experienced a regular cold in that time period, should have rejected this as a possible cause and embraced the "trauma of delivery" as the precipitating factor.

This argument ignores an assertion which follows hard on the heels of Dr. Copps' suggestion about influenza and the trauma of delivery:

> Ordinarily, youngsters who have cerebral palsy on the basis of brain damage that occurs just before, at, or just after birth, have different expression at that time which Eric doesn't demonstrate. If they have had lack of oxygen to the brain substance they develop tightness or spasticity of muscles more marked in the lower than the upper extremities. If they have had bleeding into the brain substance, they usually develop spasticity or tightness of muscles on one side of the body. This is not the case in Eric's situation.

Given Eric's "expressions," even if the Nemmers had challenged the influenza conclusion and cast around for some other cause they would have found nothing in Dr. Copps' report to suggest to them (or to a similarly situated reasonable person) that circumstances at the time of birth could be the cause of his injury. At that point, a reasonable person would not have sought other medical opinions regarding the cause of Eric's condition.

Accordingly, the Court rejects the argument that the statute of limitations began to run in 1977 when the Nemmers received the report from Dr. Copps. There is no evidence in the record to suggest any occurrence between their receipt of that report and their reading of the two newspaper articles, which could or should have given rise to a suspicion of an iatrogenic basis for Eric's affliction.

Moreover, the Court finds that a reasonable person would have suspected for the first time that medical activities at the time of Eric's birth could have caused the injuries of which Plaintiffs complain when he or she read the newspaper articles in August of 1981.

7. Accordingly, based on the record, the Court finds that neither the Plaintiffs, nor a reasonable person exercising reasonable care or reasonable diligence, would have learned or inferred from Dr. Copps' letter that Eric's condition had potentially been caused by conduct of the Navy doctors.

As set out in the *Nemmers* Appellate decision, the test that the Court is to employ is as follows:

> The first part is actual knowledge, the second is an objective inquiry. A person "should have known" enough when a reasonable man—"a reasonably diligent person (in the tort claimant's position)"— *Drazan* [*v. United States* ], 762 F.2d [56] at 59 [ (7th Cir.1985) ]—would have known enough. And what the reasonable man had to know is not a certain cause—for "truth" is not within human reach, and even after trial there may be much uncertainty—but a potential cause.

795 F.2d at 631.

In this case, the Court finds that a "reasonably diligent person (in the tort claimant's position)" would not have known "enough" prior to seeing the newspaper articles in August of 1981.

## B. Conclusions of Law

1. The two year statute of limitations in the Federal Tort Claims Act (28 U.S.C. § 2401(b), begins to run when a plaintiff has the information necessary to discover both his injury and its cause. *United States v. Kubrick,* 444 U.S. 111, 120, 100 S.Ct. 352, 358, 62 L.Ed.2d 259 (1979); *Drazan v. United States,* 762 F.2d 56, 58–59 (7th Cir.1985); *Nemmers,* 795 F.2d at 629. The running of the statute of limitations depends on when the Plaintiffs either knew of their son's injury and its cause or when in the exercise of reasonable diligence they should have known of the injury and its potential cause. *Id.* at 630–31. It is the cause within the government's control of which the federal tort claimant must have notice, actual or implied. *Drazan,* 762 F.2d at 59.

In light of the foregoing authority, and the facts specifically found by the Court, the Court finds that the Plaintiffs neither had actual knowledge (in the subjective sense), nor should they have known (in the objective sense), of a potential government cause of their son's brain damage, prior to their reading of the article in the *Peoria Journal Star* on August 26, 1981. For the Court to hold that they should have known of such a potential cause, or that they should have been more diligent in pursuing or investigating such a potential cause, as a result of their reading of Dr. Copps' report, would require more of them than reasonable care or diligence. Plaintiff's conduct met the objective standard of the "reasonable man," and their commencement of this claim was timely.

## II. DAMAGES FOR NON–PECUNIARY LOSSES TO QUALITY OF LIFE

In its *Nemmers* decision, the Seventh Circuit stated:

> The Nemmers also asked the Court to award damages for non-pecuniary losses under the rubric "quality of life." A reduction in the ability to appreciate one's own life and to experience the lives of others through books, is a real loss, just as surely as pain and suffering is a real loss. Eric does not suffer pain, but he will never live greatly. Maryland law (which applies to this case because the Naval hospital was in Maryland) allows the finder of fact to award damages for diminution in the ability to enjoy life. *McAlister v. Carl,* 233 Md. 446, 197 A.2d 140, 145 (1964).

> \*    \*    \*    \*    \*    \*

> We may assume that the award is discretionary, may be even disfavored—a reservation appropriate in light of the inadequate briefing. *McAlister* emphasizes the discretionary nature of the award and cautions against awards based on speculation. Cf. *Jones v. Malinowski,* 299 Md. 257, 473 A.2d 429, 436–37 (1984).

795 F.2d at 634.

### A. Findings of Fact

1. The evidence is unrefuted that Eric Nemmers' injuries include brain damage with severe and permanent residuals negatively affecting virtually every aspect of his life. According to Dr. Arthur L. Prensky, Eric's condition includes the following: (a) severe mental retardation (an I.Q. of 45), (b) a virtual absence of speech capability, (c) hyperactivity, (d) cerebral palsy, and (e) eye problems. (Vol. 2 at 132–138).

2. Dr. Prensky further testified that in spite of the above conditions, Eric can expect an otherwise normal life expectancy. (Vol. 2 at 137).

3. The practical effects of Eric's injuries and disabilities on his life, and his ability to enjoy life, are as follows:

a. He has made minimal progress in schooling for the mentally and physically handicapped. (Vol. 1 at 93).

b. He demonstrates no appreciation of danger to his own physical well being from his own actions, or of the danger of his action to others such as his younger brothers. (Vol. 1 at 97–98, 100).

c. He wanders off periodically. (Vol. 1 at 99).

d. His coordination is poor and he has great difficulty in climbing stairs or walking on rough terrain. (Vol. 1 at 86).

e. He cannot hop or skip. (Vol. 1 at 87).

f. His ability to perform fine motor movements is poor and he is therefore ineffective in feeding himself, caring for his own personal hygiene, or dressing. (Vol. 1 at 88–91).

g. His behavior is antisocial and he is prone to throwing fits both in private and in public. (Vol. 1 at 94–95).

h. Behavior modification attempts have failed and typical corporal punishment, such as spanking, has no effect on him. (Vol. 1 at 96).

i. Based on her observations, Eric's mother testified that his fits seem at times to be the result of the frustration he is feeling. (Vol. 1 at 95).

4. Eric Nemmers' disabilities and related problems must ultimately result in the placement of Eric in an alternative care situation, away from his immediate family, with the loss of the warmth and security of that immediate family, which would likely create a profound, adverse impact upon any person, whether or not retarded, and further deprives him of his enjoyment of life.

5. All of the foregoing findings of fact establish that Eric has suffered a substantial loss of enjoyment of life.

6. In spite of his condition as described above, Eric still has some limited ability to comprehend and to "enjoy life." He likes to swim and bowl (Vol. 1 at 102), and he enjoys riding a bicycle. (Vol. 1 at 97).

7. The Court finds that the proper amount of money to compensate him for his loss of enjoyment of life is $400,000.

**B. Conclusions of Law as to Non-Pecuniary Damages**

1. Eric Nemmers has suffered a severe and permanent injury for which general damages are awardable under the law of Maryland.

In determining damages generally, the courts of Maryland have indicated that the following factors should be considered in awarding damages in personal injury cases: (a) the personal injuries sustained and their extent and duration; (b) the effect such injuries have on the overall physical and mental health and wellbeing of plaintiff in the enjoyment of life during her life; (c) the physical pain and mental injuries suffered in the past and which with reasonable probability may be expected to be experienced in the future; (d) the disfigurement, and the humiliation and embarrassment associated with such disfigurement; (e) the medical and other expenses reasonably incurred in the past and which with reasonable probability may be expected in the future; and (f) the loss of earnings in the past and the loss of such earnings or reduction in earning capacity which with reasonable probability may be expected in the future. *McAlister v. Carl*, 233 Md. 446, 451–56, 197 A.2d 140 (1964); *Rhone v. Fisher*, 224 Md. 223, 225–26, 167 A.2d 773 (1961); *Ihrie v. Anthony*, 205 Md. 296, 305–06, 107 A.2d 104 (1954). *Burke v. United States*, 605 F.Supp. 981, 988 (1985).

2. Specifically, his injuries and disabilities have and will continue to have a profoundly negative impact on his life and his enjoyment of that life.

3. He will never have the sense of satisfaction, accomplishment, and enjoyment that comes from reading a good book or walking alone in the woods.

4. He likewise will never experience the joy of marriage and creating a family of his own.

5. To the contrary, he will soon lose the joy of warmth and security of daily life with his mother, father, and brothers, because as an adult, as the record has established, he is best off living in an "independent living" situation.

6. As was the situation in *Shaw v. United States*, 741 F.2d 1202 (9th Cir.1984), Eric's injuries and non-pecuniary losses "are multiple, grevious, and to a large extent, irreversible." *Id.* at 1209.

7. The components and measure of damages in federal tort claims actions are taken from the state law where the tort occurred. 28 U.S.C.A. §§ 1346(b), 2671 *et seq. Nemmers*, 795 F.2d at 634.

8. *McAlister v. Carl*, 233 Md. 446, 197 A.2d 140 (1964), is the seminal case from the State of Maryland on the question of the availability of damages for non-pecuniary loss of quality of life, or as the *McAlister* court has stated, "the loss of enjoyment of life." The *McAlister* court discussed in some detail the pros and cons of allowing such an award and observed:

> several objections are relied upon to defeat recovery for such damages: usually that such damages are too speculative or uncertain and are incapable of measurement in monetary terms and sometimes that such damages would overlap other elements of damage otherwise compensated for, and occasionally because of lack of causal connection.

197 A.2d at 143–144.

In our case there is no dispute concerning the issue of "causal connection," since the Court has already determined that Eric's condition is the result of the negligent conduct of the Defendant's medical personnel. As to the question of overlapping, the elements of damages that have been identified in this case are future lost wages, future care expenses, and loss of quality of life. There is no overlapping between loss of enjoyment of life and the other categories of claimed damages.

9. As to the question of the speculative or uncertain nature of such damages, the *McAlister* court said:

> The problems of determining the existence of such damages and of measuring them in money are not materially different from those involved in making any award for pain and suffering.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Purely speculative damages are not recoverable. It is difficult to lay down any hard and fast rule and to draw a clear and sharp line of demarcation between damages which are purely speculative and damages that are capable of some reasonable measurement based upon the common knowledge or experience of juries (or of judges sitting without juries). In cases involving loss of capacity to enjoy more or less usual or familiar things or activities of life, the element of

speculation seems no greater than in disfigurement cases, such as *White v. Parks* [154 Md. 195, 140 A. 70 (1928)], supra. But once we get beyond that and have to consider such a question as we have here—damages for the enforced abandonment of a desired occupation which the plaintiff had not entered upon—the problem is apt to become more difficult and the guides of common experience less sure.

197 A.2d at 144–145.

10. In *McAlister* the plaintiff complained that, because of her injury, she would not be able to pursue her intended career as a physical education instructor. She also complained that the injury she had received would interfere with her ability to enjoy swimming. In that case, while recognizing the element of damage of loss of enjoyment of life, the Court found that the plaintiff's claim was too speculative in nature. The Court concluded:

> Our examination of the testimony admitted and of the lengthy colloquies as to what the plaintiff was seeking to show leads us to think that the evidence as to whatever sense of disappointment or frustration or of loss of enjoyment the plaintiff may have experienced through her inability to become a physical education instructor was rather vague and unsubstantial. Although it is evident that she was fond of swimming and that she had elected to make physical education the major field of her collegiate education, it seems clear that she had done little to carry her ambition into practical effect. She had graduated from college, we suppose, in June and had had summer jobs as a lifeguard and swimming instructor ... We find no indication that such employment had been offered her, and certainly she had not engaged in it. Furthermore, there is no proffer of any direct evidence to show that her enjoyment of life and the work which she has since gone into is less than it would have been in physical education. On this state of the record, we think that any damages which might have been attributable to the plaintiff's inability to

become an instructor in physical education were in the realm of speculation and that on the facts the case falls within the rule of *Rhone v. Fisher,* supra, rather than of *White v. Parks,* supra. We accordingly affirm the judgment appealed from.

197 A.2d at 146.

11. In the present situation, the record establishes (in connection with the Court's finding of liability on the part of the Defendant) that, as a result of the Defendant's negligence, Eric "will never live greatly." *Nemmers,* 795 F.2d at 634. Since Eric was, from the time of birth, suffering from mental retardation and cerebral palsy, he consequently has experienced a drastic reduction in "enjoyment of life."

■ The Court does not know whether or not Eric Nemmers ever would have actually gotten married, graduated from high school or college, been a parent, or enjoyed a particular activity such as riding a horse, flying an airplane, reading a book, etc. But, based on the facts of this case, that does not mean that one can only speculate as to the existence of loss of enjoyment of life. In this situation, Eric will never be able to do *most* of the normal things of life: the first date, parenting children, reading, debating the politics of the day, etc. Eric can see but not substantially comprehend, and he can hear but not substantially understand. There may be love and affection in his life, but almost all of the developments to which a normal person is exposed during his or her childhood and adulthood will pass him by.

12. This case does not involve activities and experiences that Eric enjoyed at one time but is no longer able to enjoy. Here, it was established at the time of his birth that all of these things would be denied to him. This is the type of situation the *McAlister* court was referring to when it said:

In cases involving loss of capacity to enjoy more or less usual or familiar things or activities of life, the elements of speculation seems no greater than in disfigurement cases....

197 A.2d at 145.

■ 13. One might reasonably ask the question of how damages can be awarded for *loss* of enjoyment of life when that capability has substantially been absent from birth? The short answer is that in a case such as this, where virtually none of the accoutrements of normalcy attach to Eric's condition, the loss of enjoyment of life means a loss of any objective expectation of ever being able to experience those aspects of life normally considered to be part of our day to day existence.

14. The more serious issue is raised by the following question: If Eric's condition is as bad as the record would seem to indicate, wouldn't an award for loss of enjoyment of life be an impermissible award of punitive damages forbidden by the Federal Tort Claims Act? 28 U.S.C. § 2674.

In the case of *Flannery v. United States,* 718 F.2d 108 (4th Cir.1983), the insured party was a 22 year old man with a life expectancy of up to 30 years who became permanently comatose as the result of extensive brain damage he suffered in an automobile accident. The issue was framed by the *Flannery* court in the following fashion:

Under 28 U.S.C. § 2674 of the Tort Claims Act, damages generally are determinable under state law, for the United States is to be held liable "to the same extent as a private individual under like circumstances." But there is a qualification, the relevance and importance of which is now clearly apparent. Punitive damages are not allowable. The Federal Tort Claims Act is a waiver of immunity from suit of the United States, and conditions attached to the waiver must be strictly enforced. The government's immunity is waived insofar as compensatory damages may be determined and awarded. The door for the assertion of private tort claims in federal courts is opened that far, but then the question arises about the allowability of damages treated and labeled under state law as "compensatory" which are in excess of

those necessary to provide compensation for injuries and losses actually sustained.

718 F.2d at 110.

The *Flannery* court ultimately found that, since Flannery was "conscious of nothing" and "incapable of enjoying anything," he had undoubtedly lost his "capacity to enjoy life." *Id.* at 111. But the court went on to find that:

> There is no likelihood whatever that he will ever become aware of anything. The Supreme Court of Appeals of West Virginia held that, as a matter of state law, damages for the loss of the capacity to enjoy life were assessable upon an objective basis, and it did not matter that this particular plaintiff is unaware of his loss. It is perfectly clear, however, that an award of $1,300,000 for the loss of enjoyment of life cannot provide him with any consolation or ease any burden resting upon him. The award of the cost of future medical care provides for his maintenance as well as his nursing and professional care. It provides all of the money needed for the plaintiff's care, should he live out his life expectancy. He cannot use the $1,300,000. He cannot experience the pleasure of giving it away. If paid, the money would be invested and the income accumulated until Flannery's death, when it would be distributed to those surviving relatives of his entitled to inherit from him. If it is compensatory in part to any one, it is compensatory to those relatives who will survive him.
>
> Since the award of $1,300,000 can provide Flannery with no direct benefit, the award is punitive and not allowable under the FTCA.

718 F.2d at 111.

15. In *Burke v. United States*, 605 F.Supp. 981 (D.Md.1985), a medical malpractice case from the State of Maryland, the district court found that, based on the facts of its case, an award for loss of enjoyment of life was compensatory and not punitive.

> The *Flannery* court, therefore, held that such an award in those circumstances would be punitive in nature, because it would grant to the living plaintiff more than the actual loss suffered by him. Such an award was deemed by the *Flannery* court to be compensatory to his surviving relatives rather than to the living plaintiff since the plaintiff could not in any way enjoy the amount of the award.
>
> In the present case, however, Mrs. Burke is not comatose and has the present ability to obtain benefits from any such award. Accordingly, she is entitled to consideration of the effect her injuries have on her overall physical and mental health and well-being in the enjoyment of life during the remaining period of her life and to have an award of damages considering the same.

605 F.Supp. at 992.

16. In applying the *Flannery* case and the *Burke* case to our facts, the Court finds that since Eric is mentally conscious ("aware" to the extent that a person with an I.Q. of 45 can be aware), and is capable of some narrow capacity to enjoy life, an award for loss of enjoyment of life is appropriate. However, because of the limitations on Eric's ability to comprehend, an award in the amount requested on his behalf ($1 million) would clearly be excessive. This award is intended to compensate Eric, not someone else. *Flannery*, 718 F.2d at 111. In recognition of Eric's abilities and disabilities, the Court believes that an award in the amount of $400,000 would be appropriate. Eric is probably not capable of experiencing the pleasure of giving the money away. *Id.* However, the Court believes that this money could provide him consolation and ease the burden of his condition, *Id.*, by making available to him "things" that would occupy his attention and make his life pass more easily. Whether those "things" would take the form of a big screen television, or a special stereo system, or a razzle dazzle birthday party (with a real magician pulling rabbits out of a hat) is not for this Court to decide. The award might also mean special tutors or therapists to help him stretch his awareness to the optimum degree.

17. Some circuits other than the Fourth Circuit have refused to follow the *Flannery* decision. The dissenting circuits are identified in the case of *Rufino v. United States*, 829 F.2d 354 (2nd Cir.1987). The *Rufino* court also explains why the Second Circuit refuses to follow the *Flannery* decision:

> We disagree with, and therefore decline to follow, *Flannery*. We agree with the Sixth Circuit that the FTCA's prohibition of punitive damages was designed to prohibit "use of retributive theory of punishment against the government." *Kalavity v. United States*, 584 F.2d 809, 811 (6th Cir.1978). Even more directly on point, we agree with the Ninth Circuit's explicit refusal to follow *Flannery*, on the ground that the *Flannery* rule would "impinge seriously upon the architecture of the Act which provides for recovery according to the *lex loci delictus.*" *Shaw v. United States*, 741 F.2d 1202, 1208-09 (9th Cir.1984) (quoting *Felder v. United States*, 543 F.2d 657, 675 (9th Cir.1976)).

829 F.2d at 362.

18. In any event, whether under the analysis of the *Flannery* case or the *Rufino* case, the Court believes that an award for loss of enjoyment of life is appropriate here pursuant to Maryland law and the Federal Tort Claims Act. The Court further finds that, in keeping with the degree of loss of enjoyment of life involved, Eric's limited ability to comprehend, and the significant period of time that this loss of enjoyment of life is expected to continue (for the rest of Eric's life), $400,000 is the appropriate sum to compensate him for this loss.

## III. THE "RATE OF CHANGE OF THE COST OF ERIC'S CARE" (PRESENT CASH VALUE OF ERIC NEMMERS' LIFETIME CARE COSTS)

This Court has previously found that, based on the record, the best long-term future for Eric involves independent living, separate and apart from his parents and siblings. The Court has also previously determined that said independent living would involve, in addition to the purchase of a home:

1. The salaries of the persons who would provide the future care.

a. Manager—salary of $10,000 a year;

b. Two providers of "hands on" care—salaries of $18,000 a year apiece—$36,000.

2. Food for the care providers—$3,600 a year.

3. Unusual medical expenses per year—$500.

Grand Total—$50,100 a year.

### A. *General Legal Authority Regarding Present Cash Value of Lifetime Care*

■ 1. Awards for future medical or care expenses under the FTCA must be reduced to present cash value, *Shaw v. United States*, 741 F.2d 1202 (9th Cir.1984), and the method to be used is at the discretion of the trial court.

■ 2. The testimony of an economic expert as to future movement of wages must be based upon competent evidence of future economic trends. Such testimony, if based upon the personal experience of an actuary or someone who is merely performing an actuarial function in computing damages, lacks foundation for admissibility. *Magill v. Westinghouse Elec. Corp.*, 464 F.2d 294 (3rd Cir.1972); *Hoffman v. Sterling Drug*, 485 F.2d 132 (3rd Cir.1973).

■ 3. In the absence of well founded evidence of future economic trends or probable salary movements, an expert's opinion concerning the movement of wages over a number of years is mere speculation. *Hoffman*, 485 F.2d at 143-144.

■ 4. Where the testimony of a qualified economist includes proof of past economic trends, known economic facts, and generally accepted economic theory as to probable future economic trends, his or her testimony as to future movement of wages over an extended period of time is well founded and admissible. *Huddell v. Levin*, 395 F.Supp. 64, 82-84 (D.N.J.1975).

5. Where extended disability or death is involved, future growth of earnings can only be projected within the framework of the economy as a whole. *Id.* at 84.

### B. *Findings of Fact* [2]

At the evidentiary hearing held on this matter on March 17, 1987, the Court heard testimony from one expert from each side on the question of the proper amount of damages to be awarded for Eric's future care costs. For the reasons stated below, the Court finds that Plaintiff's expert, Dr. Edward Sattler, was qualified to testify on all relevant matters and his opinion testimony is entitled to substantial weight. The Court also finds, for the reasons listed below, the Defendant's expert, Ms. Karen Krist, was not qualified to testify as to certain relevant economic projections, and that even if she were qualified, her testimony would be entitled to little weight.

1. The Court finds that the present cash value of Eric Nemmers' future care costs is $2,111,978. (Plaintiff's Exhibit 2.). The basis of this finding is the opinion testimony of Dr. Edward Sattler, a professor of economics at Bradley University, Peoria, Illinois, who was found by the Court to be well qualified to render said opinion. (Plaintiffs' Exhibit 1; Tr. at 20–23).

2. The Court further accepts the following facts, provided by Dr. Sattler, and finds:

a. The appropriate real interest rate, or discount rate, is 3%, determined as follows:

(1) The best available evidence of long-term interest is the rate now being paid (as of the date of the evidentiary hearing) in long-term treasury bills—7½%. (Tr. at 25).

(2) The opinion and projection of leading economists establish a probable long-term inflation rate of 4½%. (Tr. at 25–26).

(3) The difference between long-term interest and long-term inflation establishes the "real interest" or discount rate for reducing future care costs to present cash value. (Tr. at 25).

b. Eric Nemmers' life expectancy is 71 years, which, given his current age (as of the date of the evidentiary hearing), leaves 57 years remaining to him. (Tr. at 27).

c. The annual salaries of the persons involved in Eric's future care, as determined by the Court at the original trial of this cause, are $46,000. These annual salary costs include $10,000 for the manager of a surrogate care program, and $36,000 for the providers of "hands on" care. (Tr. at 24).

d. In computing the present value of Eric's future care, the annual salary cost of $46,000 should receive an annual 1.9% net-of-inflation increase, or real wage increase, based upon the following facts:

(1) The annual productivity increase in the economy of the United States as a whole has been between 2% and 3% for the past 100 years. (Tr. at 83).

(2) Since World War II, real wages have increased in the economy as a whole at an average rate of 1.9%. (Tr. at 28).

(3) The ten year period of 1973–1982 included severe recessionary periods in the United States economy which produced a sharply reduced annual real-wage growth. This period of time is best described as an economic aberration, and of itself does not constitute a reliable formula for long-term future annual real-wage growth. (Tr. at 43).

(4) The average growth for the period 1983–1985 has recovered to a rate of 1.7%. (Tr. at 32).

(5) Economic indicators, and the opinion and projections of leading labor economists in the United States, establish a probable continued economic recovery with a continued increase in the annual real wage rate. (Tr. at 33, 34, 37).

(6) Future wage growth, including real wage growth for Eric's care providers, is best determined within the framework of the economy as a whole. (Tr. at 49).

---

**2.** References to the Transcript (Tr.) are to the evidentiary hearing held by this Court on March 17, 1987.

(7) The only available statistics for workers in occupations similar to Eric Nemmers' care providers—workers in nursing home and personal care facilities—show that salaries of such workers have increased at a rate equal to or slightly in excess of the average of the economy as a whole for the years 1979–1985. (Tr. at 29–30). Obviously, it would be preferable if the period of time for which these figures existed were greater, but the testimony of Dr. Sattler establishes that such figures for these workers have only been kept since 1979. Taken together with the other testimony of Plaintiffs' expert witness in regard to this matter, the Court finds that under the circumstances, the figures are reliable and not speculative. (Tr. at 79).

(8) With respect to the care program manager, the only available statistics show that wages of accountants, bookkeepers, and similar fiduciaries have increased at a pace roughly equivalent to average real wages in the economy as a whole. (Tr. at 29–30).

(9) Eric's care providers should receive annual real wage increases equal to the probable average increase of wages in the economy as a whole so as to induce them to stay on the job rather than leaving for better pay, thereby facilitating continuity in Eric's surrogate care program. (Tr. at 50–52, 77–78).

(10) The 1.9% discount rate may prove to be a very conservative number, in view of the fact that by the year 2010 to 2015, the "Baby Boomer" generation will be retiring, leaving a shortage in the job market, leading to more competition and higher wages. (Tr. at 90–91).

e. In computing the present cash value of Eric's lifetime care, the annual cost of food for Eric's care providers ($3,600), and non-routine medical care for Eric ($500), are properly given annual increases equal to probable long term inflation, and then discounted by 3% annually. (Tr. at 26).

f. Dr. Sattler's opinions were supported by current, authoritative texts in the field of labor economics, including: Campbell R. McConnell, *Contemporary Labor Economics* (1986); Reynolds, Masters, and Moser, *Labor Economics and Labor Relations* (1986).

3. The parties agree that some real wage increase would be appropriate. The question is: how much? The Plaintiffs' position is 1.9%. The Defendant's position is 0.4%. (Tr. at 146).

4. The net effect of Dr. Sattler's analysis is a "net" discount rate of 1.1%.

Q. The net effect, Dr. Sattler, if I am correct of your analysis is that starting with the discount rate of 3% and a factor of 1.9% for wage growth results in a 1.1% discount, bottom line?

A. That's correct, I refer to it as the net discount rate. Yes.

(Tr. at 73).

5. The Court finds that the Defendant's expert, Karen Krist, a pension actuary, is unqualified to render an opinion regarding the annual real wage growth of Eric Nemmers' care providers over Eric's life expectancy of 57 years. In support thereof, the Court finds as follows:

a. Ms. Krist has served as a pension actuary in Chicago, Illinois, since 1973. Prior to that she worked for five years as an actuarial student and actuary for General American Life Insurance Company of St. Louis. (Tr. at 110).

b. Her educational background includes a bachelor of science degree and one year of graduate school in mathematics. (Tr. at 113).

c. She has no formal training in economics. (Tr. at 118).

d. She recognizes that economists concern themselves with causes of economic events, while actuaries are concerned with results. (Tr. at 119). She admits that she is not qualified to testify as to the cause of economic events. (Tr. at 120).

e. The basis for any opinion testimony she would offer is her personal experience with funding of pensions from 1973 to the present, and from observation of what other actuaries are doing. (Tr. at 120, 168).

f. In previous services as an expert witness involving computations of present cash value, she has never been requested

to determine the real wage growth of workers over an extended period of time such as 57 years. (Tr. at 170).

g. She has neither conducted any research, nor consulted any authorities, pertaining to long-term future economic trends or projections pertaining to years beyond 1985. (Tr. at 128).

h. She agrees that the United States economy in the 1970's and into the early 1980's was slow, but did not cite any of the factors cited by economists for that slow period. (Tr. at 129).

i. Independent of Dr. Sattler's research and testimony, she has no knowledge of the following:

(1) The average annual real wage growth in the United States economy since World War II. (Tr. at 126).

(2) Real-wage or productivity growth in the United States economy for the last three to five years, as opposed to the last eight to ten years. (Tr. at 126).

(3) The titles or authors of the leadings texts on the topic of labor economics. (Tr. at 127).

j. The basis of any opinions she might have is personal experience as a pension actuary and her observation of what other pension actuaries are doing. (Tr. at 120). While personal experience may well act as a basis for a witness to be qualified as an expert, see Fed.R.Evid. 702, in the area of attempting to determine what the real wage growth will be over the next 57 years, personal experience alone is simply not enough, in the Court's opinion, where the experience does not include some theoretical foundation.

k. Her only research of empirical data involved one article in the January 1987 issue of the *Monthly Labor Journal;* therefore, she had not engaged in research on the economic issues at hand so as to cure her deficiencies in knowledge of economics. (Tr. at 127).

6. The Court, having permitted the Defendant to make a full offer of proof, by question and answer, of the testimony of its proposed expert, Karen Krist, (Tr. at 146), further finds that her opinion testimony would have been entitled to little weight when compared with that of Plaintiff's expert, even if the Court had found her qualified in the first instance. The Court is convinced, having heard her testimony, that she is indeed a very efficient and competent actuary. (Tr. at 144). However, in addition to the deficiencies in her training, education, experience, and knowledge, in relation to her testimony as an expert witness, the cross-examination of Defendant's expert further disclosed the following:

a. Ms. Krist felt Dr. Sattler's opinion concerning the annual real wage growth was too high (Tr. at 150–151), and that she would set it at 0.4%. (Tr. at 151–152, 163).

b. The bases of Ms. Krist's opinion were as follows:

(1) Dr. Sattler's calculations, which showed that real wages in the United States' economy had only grown at 0.4% from 1979 to 1985. (Tr. at 169).

(2) Her personal experience as a pension actuary, from 1973 to the present, indicated to her that Dr. Sattler's formula would result in the overfunding of the pension plans with which she has been involved as an actuary. (Tr. at 150).

c. The only empirical data researched by Ms. Krist covered the period 1977–1985, and was contained in an article in the January 1987 issue of *Monthly Labor Journal.* (Tr. at 127).

d. She made no effort, through research, to check for empirical data as to the annual wage movements of workers similar to the personnel who will provide and manage Eric's surrogate care.

C. *Conclusions of Law*

█ 1. Plaintiffs are entitled to the sum of $2,111,978 for the present cash value of Eric's future care costs.

2. The testimony of Dr. Sattler is persuasive as to the method of computation, the values used in the computation, and the economic justification for the 1.9% annual real wage increase in the salaries of the care providers, including the manager. His opinion was clearly stated and well sup-

ported by economic research, empirical data, and leading national authorities on labor economics. *See, Huddell,* 395 F.Supp. at 84.

3. The present cash value of Eric's lifetime care, with a base starting value of $50,100 per year, is a proper element of damages under Maryland law.

4. With regard to the Defendant's expert, Karen Krist, the Court is vested with broad discretion in determining her qualifications to testify on the issue at hand. Although Ms. Krist is undoubtedly a qualified actuary, she lacks the training and education necessary to the scientific and theoretical foundation for an opinion as to the real wage movement over the next 57 years. Likewise, she has failed to cure her deficiencies in background knowledge with research. In effect, Ms. Krist was equipped only to perform the actuarial function of checking Dr. Sattler's methods and computations. *See, Magill,* 464 F.2d at 300; and *Hoffman,* 485 F.2d at 144.

Ms. Krist's personal experience as a pension actuary covers approximately 14 years. Ten of those years, according to Dr. Sattler, include a period of severe and unusual recessionary events, making them a wholly improper and inadequate statistical basis upon which to base long-term economic projections. Since that time period was, by and large, the only period upon which Defendant's expert relied, any conclusions that she may have drawn from that period are speculative.

5. If the Court had ruled differently on the issue of the qualifications of Defendant's expert, or if the challenge to her qualifications had not been directly made, her opinion would nonetheless not have been given significant weight by the Court, at least in comparison to Dr. Sattler's testimony. She admittedly relied upon her experience with pension funding over the last 14 years (most of which involved an abnormally negative economy) to criticize the percentage for future real wage movement selected by Dr. Sattler. She cited no authorities or additional bases which might have elevated her opinion to a level sufficient to effectively challenge that of the Plaintiff's expert. Consequently, neither her substantive experience nor the duration thereof, as established by her testimony, demonstrates a satisfactory theoretical basis for her opinion to be given substantial weight by this Court.

6. Most of Ms. Krist's work experience has been with pension funds. According to the Court's understanding of her work assignment, she and her colleagues make projections on a yearly basis as to what funding will be necessary to properly fund particular pension plans. To the extent that those predictions are too high or too low, it is possible for the actuary to adjust the amounts for the following year to correct any inaccuracies. (Tr. at 131). This Court is not in a position to do that. The Court can only make this computation once. Consequently, the basis for making the calculation must involve the expanded insight and empirical data which has been given in this case only by the testimony of Dr. Sattler.

7. Dr. Sattler based his opinion on long-term data going back to 1949, and provided the Court with authority showing the rate of economic productivity in the United States economy for the last 100 years. The Court finds that this background authority gives substantial weight to his 57 year projection of 1.9%. Dr. Sattler was well-versed in the opinions of leading economists and the theoretical tenets of labor economics projecting future trends bearing on the issue at hand.

## IV. THE FUTURE LOST WAGES ISSUE

At 795 F.2d 633–634, n. 2, the Appellate Court discussed this Court's award of $661,813 in lost wages, and raised some questions concerning the accuracy of that computation and the issue of reduction of volatility of future earnings.

After raising the matter with counsel, and discussing it with them, the Court is of the opinion that it would not be proper to consider those matters on remand, since they were not issues on appeal.

As stated in the footnote:

Although the deviation of the award for lost income is mysterious, we do not pur-

sue this point as the government has not raised it.

795 F.2d at 634, n. 2.

## V.  MOTION FOR SANCTIONS

On March 6, 1987, the Court heard oral argument on Plaintiff's Motion for Order Compelling Discovery and for Attorney's Fees Pursuant to Rule 37 [Federal Rules of Civil Procedure].  The government expert, Ms. Karen Krist, was deposed by agreement in Chicago, Illinois, on February 19, 1987.  Plaintiffs complain that her deposition was a waste of time because she had not formed any opinions or conclusions, or performed any calculations (other than checking the accuracy of Dr. Sattler's math).  Plaintiffs' counsel, Mr. Durree, argued that defense counsel's conduct constituted a violation of the spirit and intent of Federal Rule of Civil Procedure 37.  In addition, at oral argument on this matter, he asserted that the provisions of 37(a)(2), (a)(3), (a)(4), and (g) provided additional bases for the Court to impose sanctions.  The sanctions requested were set out in Mr. Durree's affidavit:

| 1. Hours spent preparing for the deposition | 3.5 hours |
|---|---|
| 2. Time spent on 2–19–87 from departure to return | 5.5 hours |
| 3. Time spent preparing the Motion for Order to Compel Discovery and for Sanctions | 1.5 hours |
| TOTAL | 10.5 hours |

Mr. Durree suggests in his affidavit a customary hourly rate of $125 per hour.  10.5 hours × $125 per hour = $1,312.50.

In addition, the affidavit claims expenses incurred in connection with the deposition:

| Plane fare | $123.00 |
|---|---|
| Cab fare | 38.00 |
| | $161.00 |

| Total Attorney's Fees Claimed | $1,312.50 |
|---|---|
| Total Costs Claimed | 161.00 |
| GRAND TOTAL | $1,473.50 |

The Defendant responded to the Motion for Sanctions by arguing that it had voluntarily made Ms. Krist available for deposition without requiring Plaintiff to comply with the formal requirements of Federal Rule of Civil Procedure 26(b)(4)(A)(ii).  In addition, the Defendant argued:

1.  Mr. Durree had refused to have the Plaintiffs' expert deposed before Defendant's expert was deposed or before Mr. Durree returned from a vacation.

2.  Ms. Krist's father had died, and she was unavailable for some period of time, making the viability of the February 19, 1987 deposition date subject to question.  Also, defense counsel argued that Ms. Krist's absence from her office for the 10–14 days before the deposition because of her father's death should have alerted Mr. Durree to the possibility that she would not be adequately prepared for the deposition.

3.  Since her deposition occurred before Dr. Sattler's deposition, she could not be obliged to anticipate the possible testimony of Plaintiff's expert.

4.  Sanctions are not available under Rule 37(b) in the absence of a violation of a court order.  *Stevens v. Greyhound Lines, Inc.*, 710 F.2d 1224, 1228 (7th Cir.1983); 8 C. Wright & A. Miller, *Federal Practice and Procedure*, Section 2289 (1970).

5.  None of the other Rule sections relied on by Plaintiffs provide a basis for relief.

After hearing extensive oral argument on this matter on March 6, 1987, the Court granted the Motion to Compel Discovery.  Ms. Krist's follow-up deposition was taken on March 11, 1987, the day before the evidentiary hearing.  On March 6, this Court took under advisement the sanctions portion of Plaintiff's Motion.  The Court is now prepared to rule that the Motion for Sanctions should be GRANTED for the following reasons:

1.  It is clear from the record that the government was somewhat less than diligent in securing the opinion of an "expert witness" pursuant to the discovery schedule established by the Court on December 23, 1986.  On that date, the Court ordered that each side could select one expert on the question of future care, with discovery to be conducted within 60 days.

2. Plaintiff served expert interrogatories and a Request to Produce upon Defendant on January 14, 1987. Responses were received on February 18, 1987 (the day before the deposition), but they indicated only that "The facts and the expert's opinion more properly are area for examination during her deposition." (Plaintiff's Motion for Order Compelling Discovery and for Attorney's Fees, at 1–2).

3. It is clear from a reading of the February 19, 1987 deposition of Ms. Krist that she was almost completely unprepared to give a meaningful deposition at that time, and in fact had not even been requested to formulate relevant calculations or opinions by that date.

4. Consequently, Mr. Durree was not in a position to obtain meaningful information from Ms. Krist on February 19, 1987, and his trip to Chicago for the purpose of taking the deposition was a waste of time and effort.

5. The fact that Defendant had voluntarily waived any formal process leading up to the deposition is totally irrelevant. The parties did agree to the deposition being taken on February 19, 1987.

6. If the attorney for the government felt it was necessary to depose Dr. Sattler before Ms. Krist was deposed, and Plaintiff's counsel would not agree to that procedure, then defense counsel could have petitioned the Court for relief. He did not.

7. If defense counsel knew or had reason to believe that the death of Ms. Krist's father had some effect on her ability to be prepared for the February 19, 1987 deposition, then he had a duty to convey that to Plaintiff's counsel so as to avoid a wasted trip. He did not do so.

8. Only the attorney for the government, and not Plaintiff's counsel, was aware of the fact that Ms. Krist's expert opinions had not yet been solicited to any significant degree, and that she would not be able to answer any meaningful questions put to her by Plaintiff's counsel.

9. The government is correct that the provisions of Rule 37(b) only apply in a situation where a court order is in place.

10. As to the application of Rule 37(a) or 37(g), the Court finds:

a. Rule 37(a)(2) serves as a basis for the award of sanctions in this case. Ms. Krist "failed to answer" questions propounded pursuant to Rule 30 in that she could not answer relevant questions regarding her expert opinion (as to the appropriateness of the assumption on which Dr. Sattler's opinions were based) when she had not yet been clearly given that task by the Defendant.

b. Further, since her answers were of necessity incomplete, they were in violation of Rule 37(a)(3).

c. Rule 37(g) also acts as a basis for sanctions in this case. While it may be true that the attorney for the Defendant initially participated in good faith in framing a discovery plan, his omission in not alerting Plaintiff's counsel to the state of unpreparedness of Ms. Krist for the deposition constituted reckless disregard of the framing of a meaningful or realistic discovery plan. As to the claim by the attorney for the government that he was also unaware of the expert's state of unpreparedness, only he can take the responsibility for that. The expert was his witness.

11. In addition, this Court believes that it has the inherent power to order sanctions in such cases in order to preserve the integrity of the discovery process and to discourage unnecessary or unwarranted legal expense. The attorney for the government had to know that the trip to Chicago would be a monumental waste of time. Basically, all that Ms. Krist could say was that she had determined that Dr. Sattler's mathematical computations were correct and she had some "comments" about the assumptions upon which the math was based. She had not formulated any opinions or performed any calculations. (Karen Krist Deposition at 34).

12. Even after the deposition concluded, and counsel engaged in an on-the-record conversation regarding the adequacy of the deposition and what would happen in the future regarding Ms. Krist, defense counsel still did not know how Ms. Krist's ex-

**584**

pert opinion would be used. (Karen Krist Deposition at 42–43).

13. As to the amount of the award, the Court finds as follows:

a. The 3½ hours claimed for preparation should be reduced to 1. While the Court recognizes that a certain amount of time is required to prepare for a deposition, the Court finds that much of the preparation time for the February 19, 1987 deposition would carry over to the March 11, 1987 deposition.

b. Travel time to and from the deposition should not be charged at the full hourly rate. Four hours of the time claimed will be reduced in rate from $125 to $63 per hour to reflect the travel time. The other 1.5 hours involved in the deposition process itself will remain at the rate of $125.

c. The hourly rate of $125 is reasonable and undisputed.

d. Time spent preparing the Motion is reasonable (1.5 hours).

e. The costs claimed are reasonable.

14. Therefore, the following sanctions are ordered to be paid by the Defendant to Plaintiff's counsel:

| | | |
|---|---|---:|
| a. | Hours spent preparing for deposition —1 hour at $125 | $125.00 |
| b. | Travel time—4 hours at $63 | 252.00 |
| c. | Deposition time—1.5 hours at $125 | 188.00 |
| d. | Costs | 161.00 |
| | Total amount of Sanctions awarded | $726.00 |

## CONCLUSION

The Clerk is directed to enter judgment as follows:

It is ordered and adjudged pursuant to the opinion filed this date, that judgment is hereby entered in favor of Plaintiffs, and against Defendant, in the total sum of $3,174,517.15, said sum consisting of the following component parts: (a) $661,813.15 being the present cash value of lost wages; (b) $2,111,978 being the present cash value of future care costs; (c) $400,000 being damages for loss of enjoyment of life; (d) $726 being sanctions awarded arising out of the deposition of Defendant's expert on February 19, 1987.