Anne C. SANDERS et al., Appellants,

v.

UNITED STATES of America, DEPART-
MENT OF the ARMY SURGEON
GENERAL.

No. 75–2204.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 25, 1977.

Decided Feb. 16, 1977.

Barry J. Nace, Washington, D.C., for appellants.

Richard A. Graham, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., John A. Terry, William D. Pease and Eric B. Marcy, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before CLARK,* Retired Associate Justice of the United States Supreme Court, MacKINNON and ROBB, Circuit Judges.

PER CURIAM:

The sole question involved in this malpractice action is whether the District Court erred in sustaining the Government's motion for summary judgment on the ground that the action was not timely filed. We have concluded that the District Court was correct and affirm.

The appellants are Anne C. Sanders and her husband, Robert. On June 8, 1965, Anne entered Walter Reed General Hospital at Washington, D.C. for the purpose of

---

* Sitting by designation pursuant to 28 U.S.C. § 294(a).

giving birth to her second child.[1] She alleges that because of the negligence of Government doctors, she suffered a ruptured uterus and lacerated bladder during the course of the caesarean delivery of her child.

The Sanders filed this action November 19, 1974, Anne seeking recovery of $5 million, and her husband, $2½ million, for a kidney condition which developed as a result of the alleged malpractice. The Government moved to dismiss the action, or, in the alternative, for summary judgment on the ground that the Sanders did not file their claims with the appropriate Federal agency within two years from the date the cause of action accrued, as required under 28 U.S.C. § 2401(b). The motion for summary judgment was sustained and the suit dismissed. This appeal followed.

The record reveals that Anne was trained as a registered nurse; she had passed the Louisiana State Boards in September 1955, and practiced for two years as a staff nurse at the Veterans Hospital in Shreveport. She gave up her nursing career some two months prior to marrying Robert on August 3, 1957. Their first child was delivered by caesarean section in 1960, after which Anne suffered painful urination and required catheterization.

The complications ultimately giving rise to this action developed upon the birth of their second child on July 8, 1965. Although she had originally consented to try a natural childbirth, a caesarean section was necessary. Mrs. Sanders' deposition reflected that she found out the morning after the delivery that her uterus and bladder had been ruptured during the caesarean section and required repair, that she had a catheter inserted for about a week and did not have control of her bladder for about 4 days, but she seemed to be all right after this week of trouble. In December 1965 she asked to see her medical records because she was "curious as to what was in them."

She received the records, examined them, and returned them to the hospital. She was still having difficulty in voiding urine at that time.

In April 1966, Anne was hospitalized for treatment of a neurogenic bladder. She developed a 105° fever on April 21 (on her own check), had a deep rattling in her chest and body aches, especially in the area of her kidneys. Robert was advised that she suffered from an acute kidney infection with a diagnosis of pyelonephritis acute right etiological mechanism E. Coli and streptococcus faecalis. Robert immediately told Anne of the diagnosis and that the infection was due to all the catheterizations that were performed on her in the hospital. Nevertheless she underwent additional catheterizations as well as medical and x-ray treatment for her bladder infection throughout the remainder of 1966 and the first six months of 1967.

Robert was in Vietnam from August 1967 until August 1968, and Anne recalled neither problems nor treatments during that period. In the Fall of 1968, she experienced frequent urination and headaches and underwent further testing at Westover Air Force Base where Robert was stationed. On February 12, 1969, an ultimate diagnosis of focal pyelonephritis, chronic, left upper pole, was reached, but she testified that she was never so informed. In May 1969, a cystoscopy was performed.[2]

In March 1970, Robert was discharged from the Air Force, and Anne was given all of her medical records covering the period 1960–1970. She denied ever examining the records until after consultation with Dr. James R. Hatcher in 1973. The records were "stuck back in the file box somewhere . . . I don't have time for looking in medical records," she deposed. In early 1973, the frequency and irritation of urinating caused her to consult with Dr. Hatcher. She showed him all of the medical records of the various Army hospitals. After a

---

1. Robert was in the United States Air Force at the time, which gave Anne the right to use United States hospital facilities.

2. A cystoscopy is an inspection of the interior of the bladder through the insertion of a tube.

short hospital testing period, she was told on March 28, 1973, that "the urine from my bladder was backing up into my left kidney."

Anne's administrative claim was filed on April 24, 1974. The complaint limited her damage claim to the kidney disease alone which had its inception from the acts of malpractice. She insists her condition was not known to her until Dr. Hatcher's examination.

This court, as well as other Circuits, has decided that "the statute of limitations does not begin to run in malpractice cases until the injured party knew, or through the exercise of reasonable diligence should have known, of the facts giving rise to his claim." *Jones v. Rogers Memorial Hospital*, 143 U.S.App.D.C. 51, 52–53, 442 F.2d 773, 774–775 (1971). See also: *Reilly v. United States*, 513 F.2d 147 (8th Cir. 1975); *Coyne v. United States*, 411 F.2d 987 (5th Cir. 1969); *Brown v. United States*, 353 F.2d 578 (9th Cir. 1965). As was said in *Reilly*, "when the facts [become] so grave as to alert a reasonable person that there may have been negligence related to the treatment received, the statute of limitations [begins] to run against the appellant's cause of action." *Id.*, 513 F.2d at 150.

At the outset, we note that Anne was a registered nurse, and the progression of events beginning with her uterus and bladder rupture in July 1965, could not have been ignored by one of her educational and professional background. Robert told her in 1966 that she suffered from an acute kidney infection with a diagnosis of pyelonephritis acute right etiological mechanism E. Coli and streptococcus faecalis. Indeed, she knew that her "KUB" tests had to do with the kidneys, bladder and uterus. She acquired her medical records in 1965 because she was "curious as to what was in them." In 1970 she was given permanent possession of all of her medical records. A doctor's diagnosis dated February 12, 1969, of chronic pyelonephritis of the left kidney and diffuse clubbing of the right kidney, as well as the "KUB" report of October 4, 1966, which showed "some evidence of

chronic disease of the right kidney" were reflected in these records. She had the records for three years, but said that she "stuck them back in the files somewhere . . . I don't have time for looking in medical reports." If this is true, she acted contrary to the practice of the nursing profession and failed in her obligation to exercise reasonable diligence in determining the facts giving rise to her injury.

And there is additional ground for denying relief. Anne's long period of delay in bringing action would result in considerable prejudice to the Government. The nurse who witnessed Anne's consent to childbirth by labor, rather than cesarean section is dead; the principal medical doctor died in 1974; some of the medical reports have been lost under strange circumstances, and time has dulled the memories of all involved. Had the suit been timely filed, all of these untoward events would have been avoided.

The judgment is, therefore,

*Affirmed.*