**Luis MENDEZ, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 84 Civ. 6941 (IBC).**

United States District Court, S.D. New York.

March 1, 1990.

Speiser & Krause, P.C., New York City (Kenneth P. Nolan, of counsel), for plaintiff.

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City (Noel Anne Ferris, Sp. Asst. U.S. Atty., of counsel), for defendant.

## OPINION

IRVING BEN COOPER, District Judge.

### INTRODUCTION

Plaintiff Teresa Martinez (hereinafter "Mrs. Martinez" or "Grandmother"), guardian of minor Luis Antonio Mendez (hereinafter "Tony"), brings this action on behalf of her grandson under the Federal Tort Claims Act (hereinafter "F.T.C.A."), 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1988) alleging that he suffered and will continue to suffer mental and physical damage as a result of medical malpractice at the time of delivery. (Feb. Tr. 39; Plaintiff's Ex. 6)[1]. Defendant contends plaintiff's action is time-barred by the statute of limitations. In the alternative, defendant maintains no medical malpractice exists and any injury sustained by Tony resulted from a possible infection in his mother during her pregnancy.

On December 10, 1977 Tony was delivered by Caesarean section by physicians at Madigan Army Medical Center (hereinafter "Madigan"). Five years later on December 6, 1982 his grandmother filed an administrative claim with the Department of the Army. On November 24, 1982 Tony's father, Luis Enrique Mendez (hereinafter "Luis Sr."), a non-party to this action, filed an administrative claim as well. (Feb. Tr. 73; Plaintiff's Ex. 6) The administrative claims were denied as untimely; consequently plaintiff filed this action on September 26, 1984.

On June 5, 1985 defendant United States of America (hereinafter "United States" or the "Government") filed a motion for summary judgment on the ground that the administrative claim was not filed within the two year statute of limitations as dictated by 28 U.S.C. § 2401(b). Plaintiff moved to dismiss the Government's affirmative defense.

After a one-day trial held before us on February 6, 1986 solely on this particular issue, we rendered a decision denying the Government's motion on the ground of insufficient evidence, but granting leave to renew. We held, *inter alia:*

What we are endeavoring to point out is that the totality of the material before us does not furnish full details addressed to the essential second phase that *Kubrick*

---

**1.** Throughout this opinion, references preceded by the letters "Feb. Tr." or "Mar. Tr." refer to pages of the transcript of the trial held on February 6, 1986 or March 23–25, 1987, respectively. The trial exhibits were given a uniform designation and are referred to as "Plaintiff's Ex." and "Defendant's Ex.".

[*United States v. Kubrick*, 444 U.S. 111, 123, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979)] makes indispensable. At trial there will be ample opportunity to delve into this essential element. If the proof at that time (even if offered at the commencement of trial) establishes this vital factor to the degree the law makes imperative, we would have no alternative to directing a dismissal of the complaint and awarding judgment in favor of the government.

*Mendez by Martinez v. United States of America*, 655 F.Supp. 701, 708 (S.D.N.Y. 1987).

Subsequently, on March 23, 24, and 25, 1987 we held a trial addressed to the issue of liability. Counsel submitted post-trial papers during September 1987, wherein defendant renewed its motion to dismiss the complaint as time-barred and in the alternative, moved for dismissal based upon plaintiff's failure to establish the requisite elements of a medical malpractice claim.

In light of our earlier decision and the materials presently before us, we are compelled to re-visit the statute of limitations issue at the outset.

## THE FACTS

Luis Mendez Sr. served in the armed forces for approximately five years until he was honorably discharged on March 27, 1981. (Feb. Tr. 62–63) During a tour of duty in Korea, he met Kyong Ok Ku and they married in January 1977. (Feb. Tr. 63) Shortly thereafter, Mrs. Mendez became pregnant for the first time. (Mar. Tr. 87; Plaintiff's Ex. 7, at 24) During her pregnancy, Luis Sr. was transferred to Fort Louis in Washington (date unclear) where their son Tony was born (Feb. Tr. 64–65); Kyong received prenatal care there and in New York. (Mar. Tr. 188–189, 193, 260)

Luis Sr. was 19 years of age at the time of his son's birth. (Feb. Tr. 61–62) At that time, Mr. Mendez had a ninth grade education but eventually received a high school

equivalency diploma and completed some college work. (Feb. Tr. 62–63)

On December 9, 1977 at approximately 5:10 a.m. Mrs. Mendez was admitted to Madigan located in Tacoma, Washington because her membranes prematurely ruptured; that is, her "bag of water" had begun to leak amniotic fluid before the onset of contractions. (Mar. Tr. 26–27, 264; Plaintiff's Ex. 7, at 18; Defendant's Ex. A, at 69) Luis Sr. was by his wife's side at the hospital until 6:30 a.m. the following morning, at which time the doctors requested that he leave the room. (Mar. Tr. 265) Luis Sr. went to the waiting room and asked one of the doctors to wake him before she had the baby so he could be present at the birth. (Feb. Tr. 66)

After several failed attempts to deliver the child vaginally in which Pitocin (a labor inducement drug), midforceps, and a vacuum extractor were used (Plaintiff's Ex. 2, at 5; Defendant's Ex. A, at 4) the treating physicians diagnosed cephalopelvic disproportion, ("CPD") *i.e.*, a condition in which the baby's head cannot pass through the mother's pelvis. (Mar. Tr. 81, 129; Defendant's Ex. A, at 1) Consequently, Tony was born by Caesarean section on December 10th at 8:01 a.m. (Feb. Tr. 64, 66; Mar. Tr. 80; Plaintiff's Ex. 10, at 7)

Upon birth, Tony was limp and swollen as a result of excessive fluid within his body, and he had no apparent signs of life. (Feb. Tr. 77; Mar. Tr. 145; Plaintiff's Ex. 2, at 5) In fact, at one minute after his birth Tony was found to have no discernible heart or respiratory rate. (*Id.*)

Resuscitation efforts were made by the medical staff: Tony was intubated to clear a breathing passage; mechanical respiration was provided (Mar. Tr. 98; Defendant's Ex. A, at 3); and medications were injected into his heart. Seven minutes post delivery, Tony's heartbeat and respiration were established. (Plaintiff's Ex. 2, at 5) Tony was assessed to have an Apgar score of zero at one and five minutes of life and a score of three at ten minutes of life. (Plaintiff's Ex. 2, at 5)[2] Tony's diagnosis

2. The Apgar score is a standardized system for evaluating the physical status of a newborn.

The lowest score on the scale is zero and the highest on the range is ten, indicating a healthy,

included a laundry list of various medical problems, *inter alia,* neonatal asphyxia, congenital hydrops, and congestive heart disease. (Defendant's Ex. B, at 30)

Luis Sr. was awakened shortly after the birth of his son by Dr. Magelssen. (Mar. Tr. 265) [3] This was the first time they had met. Luis Sr. testified to the following conversation between them at that time:

A. ... [The doctors] told me I had a boy, and I was a little excited about that. Then they told me, 'But he was born with complications.' And I asked them what kind of complications, and they said, 'He wasn't breathing but we revived him' and not to—not to put my hopes too high because he probably didn't have a chance to live. And I became upset.

Q. You became emotional?

A. Emotionally upset, yes.

Q. Did you speak to the doctors as to what caused Tony's problems?

A. Yes, I asked him why was he born that way and he goes, 'That's the way some children are born.' (Feb. Tr. 67) [4]

Dr. Magelssen's testimony is consistent with that of Luis Sr. [5] Like the doctor, Luis Sr. did not expect his son to be born by cesarean section nor did he expect the labor and delivery to take as long as it did. (Feb. Tr. 74)

The day following his birth, Tony suffered from seizure-like activity which subsided after he was treated with a drug called Phenobarbital. (Plaintiff's Ex. 2, at 8) He remained in the hospital for over two months during which time he underwent several medical procedures including opening the heart to relieve pressure and intubating the lung area; Luis Sr. signed informed consent forms for both procedures. (Feb. Tr. 70, 77–78; Defendant's Ex. B, at 4) Tony was discharged in the care of his parents on February 14, 1978, but made a number of subsequent visits to the outpatient clinic at Madigan. During those visits (which occurred over the course of one half year) the staff noted Tony's severe asphyxiation (lack of oxygen), low Apgar scores, c-section [cesarean section] CPD delivery, as well as other severe medical abnormalities. (Defendant's Ex. B) In one document, a staff member noted that with respect to the infant's parents, "Do not believe they understand that he may have problems in future." (Defendant's Ex. B, at 17) [6]

In May 1978 Kyong took Tony to New York where they stayed with her mother-in-law, Teresa Martinez, until November 2,

normal baby. The score incorporates evaluation of the infant's heart rate, respiration, muscle tone, color and response to stimuli. (Mar. Tr. 95, Plaintiff's March Post–Trial Brief, Medical Definitions, at 1)

3. At trial, Luis Sr. was unable to name or describe the physician who spoke with him; however, the record reveals that in fact it was Dr. David Magelssen who discussed Tony's condition. (Feb. Tr. 66, 106, 113–115; Mar. Tr. 265) A nursing note indicates: "Dr. Greer & Magelssen here discussed condition of baby c [with] parents. Husband here 15 min.[minutes]." (Defendant's Ex. A, p. 33; *See also* Feb. Tr. 115)

4. During Luis Sr.'s deposition, he stated Dr. Magelssen said " 'things happen like that'." (Deposition of Luis Mendez, sworn to February 20, 1985 at 39)

5. Specifically, Dr. Magelssen testified: "... [T]he sense of that conversation was that I told him that his son was born with severe complications at birth and that required resuscitation because his son was not breathing, didn't have an established heartbeat, and that he was seriously ill and in the intensive care unit and under the care of the pediatric staff at that time, and that he would have a guarded prognosis, meaning that we would be uncertain if there would be further complications, and that it was too early to give him a full evaluation as to why this occurred and exactly what happened. I did indicate that we were very surprised and that we certainly didn't expect his son to be born with these complications." (Feb. Tr. 107) Dr. Magelssen confirmed that Luis Sr. was very upset and also indicated that he explained to Luis Sr. that Tony could not fit through Kyong's birth canal. (Feb. Tr. 108, 110) The doctor additionally stressed that further evaluation and observation were needed before making a prediction regarding future complications. (Feb. Tr. 109–110)

6. Luis Sr. admits, however, that the doctors told him that Tony would never be completely healthy and that he could expect Tony to have future heart and respiratory problems. (Feb. Tr. 70)

1978. (Feb. Tr. 25) During this time period, Mrs. Martinez took Tony to the Bronx Mutual Health Station for regular vaccinations and on occasion when he had a cold. (Feb. Tr. 27–28) Tony and his mother returned to Washington, and one month later (December 1978), Kyong left her husband and son because of marital problems. (Mar. Tr. 269) Unable to care for his son without Kyong's help, Luis Sr. sent Tony back to Mrs. Martinez; he has been in her care ever since. (Feb. Tr. 26, 28; Mar. Tr. 269)

Although Mrs. Martinez did not become Tony's legal guardian until February 7, 1984 (more than one year after she filed the administrative claim against the Government for medical malpractice), she was his primary caretaker since December 1978. (Feb. Tr. 88; Plaintiff's Ex. 5)

Born in Puerto Rico in 1942, Mrs. Martinez is English speaking and studied psychology and social work at the College of New Rochelle for three years where she received her Associates degree in 1979 and her Bachelors degree in 1986. (Feb. Tr. 21–22, 29; Mar. Tr. 185, 246) She has worked at Sheltering Arms Children Service, a foster care agency placing children in appropriate homes since December 1986. Prior to that she was employed since December 1979 by the City of New York Social Service Department as an eligibility specialist where she helped clients obtain *inter alia* public assistance grants, food stamps, Medicaid, PA grants, and housing. (Mar. Tr. 185–186, 247–248) In addition, Mrs. Martinez raised three children of her own. (Mar. Tr. 191)

Mrs. Martinez was not present at the hospital when Tony was born and never personally spoke with any Madigan staff. (Feb. Tr. 23) However, Luis Sr. had telephoned her several times to give her status reports as to Kyong's labor and the eventual birth of his son. (Feb. Tr. 23–24) According to plaintiff, Luis Sr. told her,

" 'Mother, the baby is a boy but he is born very sick.' " (Feb. Tr. 24) Although he did not say during that conversation what caused Tony's sickness, prior to Tony's visit to his grandmother in May 1978 and in response to her inquiry, Luis Sr. told Mrs. Martinez that "... the doctor told me that the kid is born sick and he born like that way." (*Id.*) [7] Mrs. Martinez claims that a language barrier prevented her from discussing with Kyong the cause of Tony's infirmities and what happened during her labor and delivery. (Feb. Tr. 25) Although Mrs. Martinez knew of Kyong's whereabouts since her departure (Feb. Tr. 26–27; Mar. Tr. 248–250) she never contacted Kyong.

In the ensuing years Tony's grandmother was responsible for tending to Tony's medical needs. (Feb. Tr. 88) She took him to the clinic once a month for a check-up and sought medical attention in response to specific medical problems suffered by Tony. (Feb. Tr. 27–28; Defendant's Ex. C; D) The first instance occurred on the day of his arrival to New York, when she took him for medical treatment in response to his diarrhea and vomiting. (Feb. Tr. 28) Her private physician, Dr. Perez, suggested that she take him to the hospital if Tony's diarrhea did not subside. (Feb. Tr. 29) On December 6th Tony was admitted to Lincoln Hospital and was discharged in good condition one week later. (Feb. Tr. 29; Defendant's Ex. C)

At the time of admission, Lincoln Hospital staff received oral information about Tony by Mrs. Martinez, who had in her possession no medical records. She basically informed them that Tony was "[b]orn at Army Base Hosp. [Hospital] in Washington ... by c/s [Caesarian section] due to CPD ...". (Defendant's Ex. C, at 88–89) Upon noticing an incision [8] on Tony's chest, Lincoln staff directed Mrs. Martinez to obtain Tony's medical records before they

---

[7]. During her deposition, Mrs. Martinez testified that although her son gave her no details regarding Tony's birth, she did recall that "... he told me she had a hard delivery and she had a Caesarean." (Deposition of Teresa Martinez, sworn to February 20, 1985 at 5)

[8]. On December 15, 1977, Tony had undergone a pericardial drainage and xiphoidectomy operation whereby a midline incision was made over his xiphoid leaving a visible scar. (Defendant's Ex. B, at 4)

would provide him with treatment. (Feb. Tr. 29)

Consequently, Mrs. Martinez contacted her son in Washington and requested that he retrieve Tony's medical records. (Feb. Tr. 29, 88) At trial, Mrs. Martinez identified the records she received from her son as the Madigan outpatient records for Tony. (Feb. Tr. 29–30; Ex. B)[9] Lincoln Hospital personnel duplicated these records and returned the original photocopies to Mrs. Martinez which she retained. (Feb. Tr. 30, 50)

Plaintiff admits reading these records but claims she did not understand the "big words" contained therein, nor did she ask anyone to explain their meaning to her. (Feb. Tr. 30) Mrs. Martinez claims she did not think any of her family members would understand the documents, thus she did not bother to inquire. (Id.) Moreover, she did not consult with a professional or close friend for assistance in understanding the condition of her grandson.[10]

The following notations of relevance exist within the Madigan outpatient records for Tony: December 15, 1977—"pericardial effusion operation—etiology undetermined"; January 4, 1978—"severe asphyxia at birth" and "dismal diagnosis long term"; January 26, 1978—"Diagnosis: 1) Neonatal Asphyxia [,] 2) Congenital Hydrops [,] 3) Congestive Heart Disease ... Prognosis: Guarded ... Severity: Severe" and "Discharged. Feb. 14, 1978"; March 10, 1978—"very stormy neonatal period" and "evidence for developmental lag"; March 23, 1978—"respiratory failure" and "needs close neurologic f/u [follow up]"; April 7, 1978—"1st child"; "b.wt [birth weight] 9 lb. 1 oz.", "Neonatal course with resp. [respiratory] difficulty, 'too much fluid in body' ", "birth—C-section CPD [cephalopelvic disproportion]", and "dischg [discharge] at 2 mo. [months]." (Defendant's Ex. B) Significantly, one particular outpatient document reveals that Tony's

mother was given "Pitocin thru [through] IV [intravenous] augmentation in intervals" and was under an anesthesia, "Epidural Novocaine". (Defendant's Ex. B, at 25) Moreover, the clinical record explicitly names the physicians responsible for Kyong and Tony's care—Drs. Magelssen, Phillips, Greer, and Reed. (Id.)

On February 9, 1979 Tony's aunt (name unknown) took him to Mount Sinai Hospital in New York City because he was running a high fever. (Defendant's Ex. D, at 116) Tony was not admitted as an inpatient to Mount Sinai until the following day when Mrs. Martinez returned with him because he was shaking uncontrollably. (Feb. Tr. 31, 42; Defendant's Ex. D, at 116) Hospital staff diagnosed this condition as fabrili seizures. (Id. at 76, 116) Tony remained at Mount Sinai until he was discharged on February 17th. (Id. at 73)

The hospital staff asked Mrs. Martinez many questions about Tony's medical history. (Feb. Tr. 32) In turn, she provided them with the Madigan outpatient records, telling them she did not know anything and claiming "... this is the record, you can look in there." (Feb. Tr. 32, 42–43; Mar. Tr. 207) Although Mrs. Martinez denies telling Mount Sinai staff that Tony suffered from lack of oxygen at birth (Feb. Tr. 32–33), the medical report states:

> Grandmother states pt [patient] had difficult birth c [with] 'possible brain damage from not enough oxygen'. Mother had c-section 50 hrs. [hours] p [after] water broke. At age 5d. [days] had chest op [operation] for 'fluid in lungs and heart'. Has noticed uses R [right] side less; occ. [occasional] 'cross eyes', says L [left] leg longer and doesn't crawl c [with] chest off ground.

(Defendant's Ex. D, at 24)

A Mount Sinai consultation report dated February 12, 1979 indicates:

> ... remarkable for delivery by C–Section [cesarean section] for CPD 3 wks

**9.** Luis Sr. admits he failed to read the medical records upon their receipt. (Feb. Tr. 89)

**10.** Curiously, when Mrs. Martinez was reviewing a section of Tony's Madigan outpatient records during trial, she spontaneously blurted

" 'Seizure activity resolved.' What does that mean?" (Feb. Tr. 42) Similarly, when reading another page, she inquired as to what "PT" [patient] stood for. (Feb. Tr. 45)

[weeks] premature. At the time of delivery there was no respiration or heart beat. Apgar 5 min. 0 10 min. 3. His neonatal course was complicated by pleural, effusions, ascites, cardiomyopathy, pericardial effusion, shock lung, hypotremia, and seizures. The nature of the seizures in not known.... Development has been slow but exact details are not known.... Impression: 1) Prolonged major motor seizure 2) Developmental delay probably due to neonatal course (hypoxia).

(Defendant's Ex. D, at 91–92)

Since early 1979, Tony has been continually medicated for his seizure problem. (Feb. Tr. 48; Mar. Tr. 200–201) According to his grandmother, Tony suffered three more seizures between February 1979 and his second admission to Mount Sinai on January 12, 1981. (Defendant's Ex. D, at 44) During this period, Tony was an outpatient at Mount Sinai. His reports during that time note his medical history, examination results and progress. (Feb. Tr. 33; Plaintiff's Ex. 3, at 11; Defendant's Ex. D)

On January 12, 1981 Tony was admitted to Mount Sinai for a cat scan; he was discharged the next day. (Mar. Tr. 206; Defendant's Ex. D, at 66) The intake report reveals "informant grandmother cooperative but extremely unknowledgeable about pt's [patient's] medical history." (Defendant's Ex. D, at 44) Also contained within this document was a summary of Tony's delayed development: "11 months—holding up head; 1⁹/₁₂ year—standing; 2½ years—walking and words, *i.e.,* 'good-nite, Mama.' No sentences yet. Not toilet trained. Unable to dress himself. Cannot eat alone." (*Id.* at 45) It is not clear from the record whether this information ·was provided orally by Mrs. Martinez or by reference to other medical records, but Tony's grandmother testified that "[h]e learned to walk when he was about 3 or 4 years old, 3 and a half or 4." (Mar. Tr. 202–203) She also stated he began to speak at age four or four and a half. (Mar. Tr. 203) Additionally, she acknowledged that his right side was much weaker than his left. (Mar. Tr. 203)

In 1981, Tony's grandmother took him to a Bronx family day care center. (Feb. Tr. 33) They cared for him temporarily and then referred Mrs. Martinez to a facility called the Kennedy Center. (Feb. Tr. 34; Mar. Tr. 201) Toward the end of 1981, Kennedy Center staff informed her that Tony needed a special school and suggested Chama, a special day care center for children. (Feb. Tr. 34–35; Mar. Tr. 201) Mrs. Martinez never asked them why Tony needed special assistance. She maintains that she did not ask "[b]ecause I think he is born very weak, you know, very sick and maybe he delayed." (Feb. Tr. 34)

On October 20, 1982 Mrs. Martinez happened to read a newspaper article in the *New York Post* of that date headlined "Girl, 5, wins $4.6M settlement." (Feb. Tr. 36) The article was about a five year old brain damaged girl who received a 4.6 million dollar settlement award from the hospital in which she was born. The piece reads as follows:

> A brain-damaged 5–year old girl will have a $3000–a–month income for life as the result of a $4.6 million settlement reached yesterday with Brookdale Hospital Medical Center.
>
> Brooklyn Supreme Court Justice Frank Composto approved the out-of-court deal that will give Argenida Gomez the tax-free income for the rest of her life.
>
> Kenneth Nolan, attorney for the bright-eyed girl, said that "when her mother was in labor she suffered a lack of oxygen which resulted in brain damage and mental retardation. [sic]
>
> "She is moderately retarded. She can walk, but it took her two years and four months to do that. [sic]
>
> "She speaks on the level of a two-year-old," Nolan told the Post.
>
> Nolan said he originally filed suit for $20 million two years ago and agreed to settle out of court when Brookdale Hospital "suggested that we open settlement negotiations."
>
> Besides receiving $3000 a month, the Queens girl will be paid lump sums of $100,000 in 1992 and in 1997, with succes-

sive lump-sum payments of $150,000 and $200,000.

"I'm very happy for my clients," said Nolan, who works for Speiser and Krause of 200 Park Av.

If Argenida dies before turning 20, her mother, Sonia, 39, will receive $3000 a month until 1997. (Plaintiff's Ex. 1)

Subsequent to reading the newspaper story, Mrs. Martinez noted to herself the similarities between Tony and the girl in the article. She testified as to her thoughts in this regard:

> ... [S]he—small delivery, retarded, she can walk, but she took two years and month—and four months to do that. And I say, well, my grandson took almost three years, three and a half to do it. Then, you know, and I said, you know, he can, you know, he can talk and nothing like that, say maybe this is the same.

(Feb. Tr. 37–38) Mrs. Martinez discussed the article with her work supervisor. She advised her to call the attorney who represented the plaintiff in the reported case. (Feb. Tr. 36–37) Mrs. Martinez met with Mr. Nolan that same day. (Feb. Tr. 38)

At trial, Mrs. Martinez was asked by her attorney:

> Q. Now, Mrs. Martinez, just so we are clear, when for the first time did you learn that Tony's condition could have been caused by the medical malpractice of the doctors at birth?
> A. When I went to your office and you told me, explain to me. (Feb. Tr. 41)

Since the end of 1982 (after plaintiff met with Mr. Nolan and filed her claim), Mrs. Martinez has made extensive inquiries on Tony's behalf. As a result, Tony has been diagnosed with a mild form of cerebral palsy and has been benefitting from extensive therapy and educational testing. (Mar. Tr. 223; Plaintiff's Ex. 3) Although disabled, Tony seems presently to be flourishing.

## CONCLUSIONS OF LAW

Statutes of limitations are intended to "promote justice" by preventing the pre-

sentation of claims which have been dormant and are later revived when "evidence has been lost, memories have faded, and witnesses have disappeared." *Order of Railroad Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 348–349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). We are mindful of the important theory underlying statutes of limitations—"that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Id.* at 349, 64 S.Ct. at 586.

This policy consideration is reflected in the Federal Tort Claims Act, in which Congress waived sovereign immunity to allow a claimant to bring an action against the government but only within a limited time frame. The Act provides:

> [A] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b) (1983).

The objective of the limitations statute "is to require the reasonably diligent presentation of tort claims against the Government[,]" *United States v. Kubrick*, 444 U.S. 111, 123, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979), and thus courts are constrained to strictly construe the Act carefully adhering to its provisions. As the United States Supreme Court stated in the landmark *Kubrick* case:

> Section 2401(b), ... is the balance struck by Congress in the context of tort claims against the Government; and we are not free to construe it so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims ... We should also have in mind that the Act waives the immunity of the United States and that in construing the statute of limitations, which is a condition of that waiver, we should not take it upon our-

selves to extend the waiver beyond that which Congress intended.

*Id.* at 117–118, 100 S.Ct. at 357 (citations omitted).

It is recognized that the rigid application of the FTCA's statute of limitations may sometimes lead to hardship for plaintiffs, *See Steele v. United States,* 599 F.2d 823, 828 (7th Cir.1979), but its intent was not to "... guarantee that every injured party will necessarily be able to find and make a claim against a possibly responsible governmental agency. Rather, it represents a Congressional determination of a reasonable amount of time for injured parties in general to discover and make claims against the government." *Zeleznik v. United States,* 770 F.2d 20, 24 (3d Cir. 1985), *cert. denied,* 475 U.S. 1108, 106 S.Ct. 1513, 89 L.Ed.2d 913 (1986).

The general rule under Section 2401(b) is that an action accrues at the time of injury, since the plaintiff at that time usually has notice of the cause of the injury and of infringement upon his or her legal rights. *Camire v. United States,* 489 F.Supp. 998, 1001 (N.D.N.Y.1980); RESTATEMENT (SECOND) OF TORTS § 899 comment c (1977). However, this rule has been relaxed in certain medical malpractice cases in which an injury is not immediately manifest and a plaintiff does not realize he or she has been injured.

In *Quinton v. United States,* the Fifth Circuit Court of Appeals applied the "blameless ignorance" standard as set forth in *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949)[11], whereby a plaintiff may not be charged with knowledge of an injury which has not yet manifested itself and which is inherently unknowable. *Quinton v. United States,* 304 F.2d 234 (5th Cir.1962).[12] Thus, a cause of action for malpractice does not accrue until the plaintiff has discovered, or in the exercise of reasonable diligence should have discovered, his injury. *Id.* at 240. It is necessary, however, that a plaintiff exercise "diligence" in order to benefit from the blameless ignorance rule. *Camire,* 489 F.Supp. at 1003.

Put another way, regardless of whether or not wrongdoing is suspected, the statute of limitations begins to run when the plaintiff knows of the injury and its cause or has a duty to inquire into the cause. *See Cragin v. United States,* 684 F.Supp. 746, 754 (D.Me.1988), *aff'd,* 873 F.2d 1433 (1st Cir.1989).

In *Kubrick*[13], the Supreme Court rejected the view that a claim accrues at the time a plaintiff believes a legal cause of action of medical malpractice exists and refused to equate plaintiff's ignorance of his legal rights with his ignorance of the fact of his injury or its cause. 444 U.S. at 122, 100 S.Ct. at 359. Such a rule, the Court held, would permit a plaintiff to initiate a suit at

**11.** In *Urie,* plaintiff contracted silicosis as a result of inhaling silica while working on a steam locomotive for a period of thirty years. The disease was not diagnosed until after he became too ill to work; there was no suggestion that he should have known he had silicosis at any earlier date. Because it involved the slow disintegration of his lungs, the court found plaintiff had no knowledge of the disease the symptoms of which had not yet obtruded on his consciousness. Hence, the court held that plaintiff's injury was "unknown and inherently unknowable," and because of this "blameless ignorance" his cause of action did not accrue under the Federal Employers' Liability Act until the disease manifested itself. *Urie v. Thompson* 337 U.S. 163, 169–170, 69 S.Ct. 1018, 1024–25, 93 L.Ed. 1282 (1949).

**12.** The basis for this rule is that courts "can see no sound reason for permitting the Government to escape liability ... simply because its alleged

negligence was such as to remain undiscovered and, practically speaking, undiscoverable, for many years thereafter." *Id.* at 241. The courts did "not believe that Congress 'intended such consequences to attach to blameless ignorance.'" *Id.*

**13.** In *Kubrick,* several weeks after receiving neomycin, an antibiotic treatment for an infected leg, plaintiff experienced a ringing sensation in his ear and ultimately suffered a loss of hearing. The court held Kubrick's cause of action did not await his awareness that prescription of neomycin for infection was an improper negligent act; rather, his claim accrued when he was informed that the hearing loss might have been the result of the neomycin treatment. Once plaintiff was aware of the "critical facts ... [t]here are others who can tell him if he has been wronged, and he need only ask." *Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359.

any time, without any prompt inquiry, within two years from the time he concludes that he has been wronged. *Id.*

The plaintiff need not have knowledge of fault in the legal sense for the statute to begin to run, but she must have knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection between the treatment and injury or (b) to seek professional advice, and then, with that advice, to conclude that there was a causal connection between treatment and injury.

*Harrison v. United States,* 708 F.2d 1023, 1027 (5th Cir.1983). It is important to note that a plaintiff does not have to know the full extent of his or her injury, nor must he know the cause of his injury in exhaustive detail. *Allen v. United States,* 527 F.Supp. 476, 490 (D.Utah 1981) (citations omitted).

### Legal Analysis as Applied to Tony's Grandmother

As discussed at length in our decision subsequent to the first trial, our primary focus is not on the issue of plaintiff's knowledge of the injury, but rather on whether she knew or with reasonably diligent inquiry should have known the cause. As to the question of whether plaintiff knew of the injury, we entertain no hesitancy in concluding in the affirmative. We find that Tony's condition was manifest as early as the time of his birth. Although plaintiff was not present at that time, she knew Tony was delivered unexpectedly by Caesarian section and that he was very sick at birth. She was also aware of his numerous medical problems during the time he lived with her, *i.e.* his fifth month to his eleventh, and subsequent to his first birthday, of his slow developmental growth, of the weakness on the left side of his body and of his inability to perform many tasks normally.

In short, Mrs. Martinez had first-hand knowledge by personal observation of Tony's disorders. " ... [A] claimant has knowledge of his injury when he knows the general nature of the injury; the lack of knowledge of the precise nature of the injury, such as its permanence, extent, or ramifications, does not toll the statute."

*Arvayo By & Through Arvayo v. United States,* 580 F.Supp. 753, 766 (D.Kan.1984), *rev'd on other grounds,* 766 F.2d 1416 (10th Cir.1985). Thus, we find Mrs. Martinez had sufficient information to make her aware of Tony's condition.

In an attempt to avoid the harsh results imposed by the statute of limitations, plaintiff maintains despite her knowledge of Tony's physical impairments, she did not suspect that Tony suffered mental impairment and thus did not know the full extent of his injury. As we found in our earlier decision, plaintiff's knowledge of injury incorporates Tony's mental abnormalities. It is clear from his medical records and we conclude that plaintiff was aware of Tony's possible brain damage: "Grandmother states pt [patient] had difficult birth c [with] 'possible brain damage from not enough oxygen.'" (Defendant's Ex. D, at 24)

Plaintiff contends this is hearsay evidence and thus inadmissible. We find the document admissible and give it great weight. We conclude it is not hearsay—as it is not being offered "to prove the truth of the matter asserted[,]" *i.e.,* to prove Tony lacked oxygen at birth and suffered possible brain damage. Rather, it is being offered to establish what Mrs. Martinez knew or believed. *See* Fed.R.Evid. 801(c).

Assuming *arguendo,* the evidence is hearsay, we find it falls within the medical records exception. "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment [are admissible evidence]." Fed.R.Evid. 803(4).

Statements need not refer to the *declarant's* physical condition. 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 803(4)[01] 1988. Statements made for purposes of diagnosis or treatment relating to someone else may be admissible: "The relationship between declarant and patient will usually determine ad-

missibility." *Id.* In the case of a child, the parent or guardian's statements on behalf of the child is assumed reliable, thus admissible. *Id.*

The next question is whether with reasonably diligent inquiry the cause of Tony's injury should have been known to Mrs. Martinez; we do not doubt that the cause of the injury was not known to her. (Feb. Tr. 41) The issue of reasonable diligence is determined by an objective standard that measures the actions of a reasonable person in plaintiff's position armed with the same information. *See Drazan v. United States,* 762 F.2d 56, 59 (7th Cir. 1985); *Zeleznik,* 770 F.2d 20, *cert denied,* 475 U.S. 1108, 106 S.Ct. 1513, 89 L.Ed.2d 913 (1986); *Arvayo,* 580 F.Supp. 753, *rev'd on other grounds,* 766 F.2d 1416; *Nemmers v. United States,* 612 F.Supp. 928 (D.Ill.1985), *vacated,* 795 F.2d 628 (7th Cir. 1986), *on remand,* 681 F.Supp. 567 (D.Ill. 1988), *aff'd,* 870 F.2d 426 (7th Cir.1989).

The question of whether a plaintiff has employed reasonable diligence in inquiring as to the cause of injury varies with the specific facts of each case. *See Arvayo,* 766 F.2d at 1422. The term "diligence" is not easily susceptible to exact definition, and its meaning is determined by the circumstances of each case. 26A C.J.S. *Diligence* 943 (1956). It has been characterized, however, as a duty of care such that "the graver, more important, or valuable the interests involved, and the more imminent the peril, the more is the vigilance required...." *Id.* at 944. When the facts of the situation are grave enough to warrant a reasonable person to exercise diligence in bringing suit within the statute of limitations, failure to do so bars recovery. *See West v. United States,* 592 F.2d 487, 492–493 (8th Cir.1979); *Hulver v. United States,* 562 F.2d 1132, 1134 (8th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978); *Reilly v. United States,* 513 F.2d 147, 150 (8th Cir.1975).

The kinds of factors courts look to in ascertaining reasonable diligence is illustrated in *Nemmers,* 612 F.Supp. 928 (D.Ill. 1985), *vacated,* 795 F.2d 628 (7th Cir.1986), *on remand,* 681 F.Supp. 567 (D.Ill.1988), *aff'd,* 870 F.2d 426 (7th Cir.1989).

In *Nemmers,* a child with cerebral palsy was delivered at a Navy Hospital after a difficult labor. The parents initiated suit after reading about a similar case in a local newspaper. The newspaper article discussed a medical malpractice settlement involving a child who sustained brain damage due to lack of oxygen during delivery. When their child was approximately twelve months old and not even ready to begin walking, his parents began pursuing medical information. They made inquiries to two pediatricians; one allayed their concerns and the other suggested a relationship between his failure to walk and an eye problem. His parents then took him to a neurologist for testing, and he was eventually diagnosed with cerebral palsy. Although the parents persistently attempted to learn from the physicians the cause of his condition, they were assured that "... it was just one of those things and only God knows the cause." *Id.* at 930. Under the circumstances, the court found "that the [p]laintiffs made prompt and reasonable inquiring concerning [their son's] condition." *Id.,* 681 F.Supp. at 570, *aff'd,* 870 F.2d 426.

A plaintiff need not engage in as industrious an inquiry as did the Nemmers in order to meet the reasonable diligence standard; however, "subjective factors such as trust, youth, and naivete are irrelevant in determining whether [p]laintiffs fulfilled their duty to inquire" and cannot justify inaction. *Cragin,* 684 F.Supp. at 754, *aff'd,* 873 F.2d 1433. The *Cragin* court rejected the plaintiffs' claim that "... personal factors excused them from inquiring.... [T]heir longstanding trust in the military medical system, which [they claim] kept them from suspecting wrongdoing or questioning doctors' decisions ..." did not relieve them from inquiring into their daughter's treatment. *Id.; see also Arvayo,* 766 F.2d at 1422.

In the instant case, we acknowledge that Mrs. Martinez has carried the burden of raising and caring for Tony on her own since approximately his first birthday.

However, we cannot ignore that by accepting this role of primary caretaker, she assumed a high degree of responsibility for Tony, especially in light of his medical conditions.

Under the circumstances we believe a reasonably diligent person would have obtained the same level of knowledge regarding Tony's condition at birth that a natural parent would have acquired by virtue of giving birth. Mrs. Martinez could have asked for medical information from Kyong or Luis Sr., and if they were unable to adequately explain the facts to her, she could have tried to understand the accessible medical records. We believe a reasonable person would have tried, at the minimum, to gain the historical knowledge needed to make sound judgments regarding Tony's present and future welfare. It is not necessarily the depth of the inquiry that is indispensable, but rather, it is the failure to gather the relevant and significant information covering the time span prior to the direct involvement of plaintiff, the primary caretaker.

We are also concerned with plaintiff's inaction from the point at which she assumed responsibility for Tony. We are troubled by the fact that plaintiff never took an affirmative approach to learn about her grandson's condition; her interactions with Tony's doctors were limited to routine visits to the hospital clinic or in response to acute medical problems experienced by Tony (*e.g.*, fever, diarrhea, vomiting, and seizures). While Mrs. Martinez on one occasion asked a Mount Sinai physician what caused Tony's epilepsy, (Feb. Tr. 31) we find this instance standing alone to be insufficient. The severity of Tony's condition, coupled with the fact that plaintiff was not a direct participant in the pre-natal care, birth and first phase of Tony's life, warrants a more diligent and persistent effort on the part of Mrs. Martinez to inquire into the cause of Tony's *overall* condition. This is particularly so under the circumstances where the medical personnel were readily available and familiar with Tony's condition.

Moreover, Tony's medical records are an important source of information which should have triggered inquiry. The outpatient records which Mrs. Martinez possessed for four years indicate Tony's serious medical problems since birth. On several occasions, the hospital staff requested these records or Mrs. Martinez voluntarily shared them. She also maintained them in her possession.

In *Cragin*, 684 F.Supp. 746, plaintiff's parents possessed their child's medical records for many years before examining their content. A look into these records would have triggered an inquiry by them as to the omission of important medical information. The *Cragin* court applied the objective standard of a "reasonable parent" in the Cragins' position, and concluded that plaintiffs' failure to examine the medical records and their "... failure to make any inquiries whatever falls below the objective 'reasonable parent' standard that governs this action." *Cragin*, 684 F.Supp. at 755, *aff'd*, 873 F.2d 1433. The court stressed that a reasonable parent would have made some type of inquiry. *Id.* at 754. Likewise, in *Sanders v. United States*, 551 F.2d 458 (D.C.1977), plaintiff was in possession of her medical records for three years prior to filing her medical malpractice action; the court held that she "failed in her obligation to exercise reasonable diligence in determining the facts giving rise to her injury." *Id.* at 460.

In the case at bar, we are not dealing with a situation where "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." *Harrison*, 708 F.2d at 1028, *citing*, *Kubrick*, 444 U.S. at 123, 100 S.Ct. at 360. To the contrary, Mrs. Martinez held onto Tony's medical records for four years and should have made an effort to read and understand them. Despite her claim of lack of comprehension of the documents, we find that a reasonably diligent person in Mrs. Martinez's position, equipped with little background knowledge regarding the medical history of her grandson for whom she was the caretaker, would have asked one of the many physicians or medical staff

to explain the information contained within the records. Significantly, during Tony's many routine clinical visits, Mrs. Martinez was in continuous close contact with hospital personnel who were obviously qualified to understand and explain the meaning of the medical terminology in Tony's records. "[Mrs. Martinez] need only have made inquiry among doctors with average training and experience in such matters to have discovered that ... [she may have] a good cause of action." *See Kubrick*, 444 U.S. at 123, 100 S.Ct. at 360.[14]

Indeed, had plaintiff inquired. as to the content of Tony's outpatient Madigan records a competent medical person in all likelihood would have requested all medical records concerning Tony and his delivery, especially since the records that were available indicated that Tony was delivered by cesarean section due to CPD[15], had low Apgar scores, and lacked oxygen at birth. Also noted in Tony's outpatient records were the facts that Kyong was administered Pitocin and had an epidural during her labor period.[16] (Defendant's Ex. B, at 25) In addition, the names of the treating staff during her labor and delivery were specifically named and could have been contacted. It is evident that given this set of facts and Tony's present health problems, had plaintiff asked questions about the cause of Tony's condition, a competent physician would have investigated further.

A request for information would have revealed Kyong's in-patient and out-patient medical records (concerning her labor as well as Tony's delivery) and Tony's in-patient records (documentation of his birth and his two month stay immediately thereafter). These records indicate "complicated live born" and attempts at vaginal delivery (using Pitocin induced labor, suction with a vacuum extractor having a worn gasket, and midforceps rotation) failed. (Plaintiff's Ex. 10, at 5–7; Defendant's Ex. A, at 1–4)

Mrs. Martinez was not relieved from the objective standard of reasonable inquiry based on her conclusion that review of Tony's records by her family would not have been helpful since they would not have understood the meaning of the terms in the medical reports. If we were to follow this reasoning to its logical conclusion, all plaintiffs in the position of Mrs. Martinez could put off inquiry simply because, in their opinions, close relatives would not understand the documents. As the court stated in *Cragin*, 684 F.Supp. 746: "... [I]t is the duty to inquire, and not the perceived ineffectiveness of the inquiry, that sets the statute of limitations running. The fact that a reasonably diligent investigation would not have discovered government negligence is not relevant for the purpose of accrual under the [FTCA] two-year statute of limitations...." *Cragin*, 684 F.Supp. at 755, *aff'd*, 873 F.2d 1433.[17] Moreover, there were a number of people other than family at the disposal of Mrs. Martinez (*e.g.*, the many physicians and medical personnel with whom Tony dealt) who could have explained the contents of Tony's medical records.

**14.** The *Kubrick* court barred plaintiff's claim because he did not make any inquiry despite the fact he had consulted several specialists and was in possession of all the facts about the cause of his injury for three years before filing a claim. *Id.*

**15.** Cephalopelvic Disproportion (CPD) is "[a] condition in which the head of the fetus is abnormally large in relation to the size of the mother's pelvis[,]" 1 J. SCHMIDT, ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER C–99 (1986); *See also* STEDMAN'S MEDICAL DICTIONARY 254 (5th ed. 1982), which may "lead ... to difficulties in delivery." MILLER & KEANE, ENCYCLOPEDIA AND DICTIONARY OF MEDICINE, NURSING, AND ALLIED HEALTH 369 (4th ed. 1984). When a CPD diagnosis is made, "[a] cesarean section is done to avoid the effects on the infant of a prolonged labor or a traumatic delivery." 5B LAWYERS' MEDICAL CYCLOPEDIA OF PERSONAL INJURIES AND ALLIED SPECIALTIES § 37.21(B)(4) (3d ed. 1984).

**16.** Once cephalopelvic disproportion is diagnosed, Pitocin is not safe to use and is contraindicated (Mar. Tr. 58, 61, 228) In addition, use of an epidural anesthesia may inhibit a mother's ability to push the baby during contractions. (Mar. Tr. 86)

**17.** The same would hold true if the medical or legal community misguided or misinformed a plaintiff. *Kubrick* 444 U.S. at 124, 100 S.Ct. at 360.

A few examples that demonstrate the lack of diligence displayed by plaintiff are as follows: Plaintiff's reason for never trying to contact Tony's mother in California (she may have been able to obtain more information directly from Kyong regarding Tony's birth) was because Mrs. Martinez did not have a telephone; this is a feeble excuse and unreasonable at best. During the trial, Mrs. Martinez was quite inquisitive when reviewing Tony's Madigan medical records. For example, when reviewing a section of Tony's Madigan outpatient records, she exclaimed: " 'Seizure activity resolved.' What does that mean? " (Feb. Tr. 42). On another occasion while reading an exhibit, she inquired as to the meaning of "PT" [patient]. (Feb. Tr. 45) These inquiries were in direct contrast to plaintiff's conduct prior to trial. We find that the type of inquiries made by Mrs. Martinez during trial should have been made much earlier.

Nor are we persuaded by plaintiff's reliance over the course of five years on one statement her son made to her after Tony was born: "... the doctor told [Luis Sr.] that the kid is born sick and he born like that way." (Feb. Tr. 24) We find that a reasonably diligent caretaker would not have relied on one inexplicit and vague statement made by the physician during a very taxing time as the entire "cause" of a child's serious illness.

Furthermore, it is the duty of the plaintiff to inquire and not the duty of the physician to disclose that is essential. *See Arvayo*, 766 F.2d at 1422; *Cragin*, 684 F.Supp. at 755, *aff'd*, 873 F.2d 1433. Even when a doctor advises a patient that the condition is "normal" and does not indicate any wrongdoing in the patient's treatment, courts do not extend the statute of limitations:

> No court can force a Government defendant to admit its malfeasance or suffer the consequences, to wit, toll the statute of limitations until an injured party has actual notice that a particular act constituted malpractice. This would clearly expand the circumstances under which the Government could be sued, and since any exceptions to the Government's

waiver of sovereign immunity must be strictly observed, such a result ... [can not stand].

*DeGirolamo v. United States*, 518 F.Supp. 778, 782 (E.D.N.Y.1981).

Finally, although the reasonable diligence standard is guided by objective factors, we cannot ignore the facts that Mrs. Martinez is 1) college educated; 2) a social worker, who once helped individuals obtain public assistance, Medicaid and housing and is now employed by a foster care agency for children; and 3) a parent, responsible for raising three children of her own. *See Sanders*, 551 F.2d 458 (plaintiff's failure to inquire unreasonable given her educational and nursing background).

We do not intend to disparage the care of Mrs. Martinez's for her grandson, nor do we doubt her love and dedication to Tony. Yet, when the standard of reasonably diligent inquiry is applied, we cannot avoid the conclusion for all the reasons stated hereinabove that plaintiff failed to act reasonably; that the totality of all the circumstances should have triggered an inquiry by a reasonably diligent plaintiff. *See Cragin* 684 F.Supp. at 754.

We shall briefly address plaintiff's claim that the event which triggered her inquiry was her reading of the newspaper article on October 20, 1982. Defendant asserts that this event cannot constitute the point of accrual for statute of limitations purposes because the only new fact plaintiff discovered was that another person received a large monetary award from a medical malpractice settlement; she was already on notice of Tony's condition.

The law is clear that accrual of a FTCA claim does not await plaintiff's awareness that his injury was negligently inflicted and that damages may be procured. *See Kubrick*, 444 U.S. at 123, 100 S.Ct. at 360. Hence, discovery of a potential legal medical malpractice claim is irrelevant to the running of the statute of limitations. *See Gustavson v. United States*, 655 F.2d 1034, 1037 (10th Cir.1981); *Allen*, 527 F.Supp. at 490. Indeed, in *Cragin*, 684 F.Supp. 746, the court stressed that a claim against the

government cannot await the moment a plaintiff hears the broadcast of a news report or reads a magazine article since that could toll the statute of limitations indefinitely. *Cragin*, 684 F.Supp. at 756, *aff'd*, 873 F.2d 1433.

Following the rationale of Mrs. Martinez, this action would not have been brought had plaintiff not read the *New York Post* article on October 20, 1982—which in fact could have been published at any point in time, or not at all. This proposition goes against the policy underlying the FTCA, which seeks to limit the period of liability and relieve the government of the everpresent threat of stale claims. Further, a plaintiff would have no incentive to timely file a claim, holding defendant forever vulnerable to plaintiff's claim and unable to adequately defend itself long after the injury occurred. *See Id.*

### Legal Analysis as Applied to Tony's Father

Our conclusion applies with equal force to Luis Sr. Luis Sr. witnessed his son's abnormal conditions since birth and his two month stay at Madigan. In addition, he knew Kyong had a difficult labor, lasting five times longer than he had originally anticipated, and resulting in an unexpected cesarean section. We conclude Luis Sr. knew of Tony's injury. *See Kubrick*, 444 U.S. 111, 100 S.Ct. 352; *Arvayo*, 580 F.Supp. 753, *rev'd on other grounds*, 766 F.2d 1416; *Allen*, 527 F.Supp. 476.

We find that although he did not know the cause of the injury, Mr. Mendez, as Tony's natural parent, did not exercise the reasonably diligent inquiry as to the cause that is required by law. *See Kubrick*, 444 U.S. 111, 100 S.Ct. 352; *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir.1985); *Zeleznik*, 770 F.2d 20, *cert denied*, 475 U.S. 1108, 106 S.Ct. 1513, 89 L.Ed.2d 913 (1986); *Arvayo*, 766 F.2d 1416, *rev'd on other grounds*, 766 F.2d 1416; *Nemmers v. United States*, 612 F.Supp. 928 (D.Ill.1985), *vacated*, 795 F.2d 628 (7th Cir.1986), *on remand*, 681 F.Supp. 567 (D.Ill.1988), *aff'd*, 870 F.2d 426 (7th Cir.1989).

Tony was stationed near the medical center and could have readily sought out information. In fact, he did not read the records he did obtain. *See Cragin*, 684 F.Supp. 746, aff'd, 873 F.2d 1433. From his deposition testimony it is evident that as a parent, Luis Sr. did not sufficiently involve himself with his son's care. (Deposition of Luis Mendez, sworn to February 20, 1985 at 23–24, 30, 33, 35–36, 43–44) We find for all intent and purposes, Luis Sr. made no inquiry. For a father to rely exclusively on a vague response made by a physician to the question "What happened?" immediately after going through a long and tiring ordeal is unreasonable and inconsistent with the inherent interest a parent should have in getting the best care obtainable for a child.

### CONCLUSION

In the case at bar, we have had "... the delicate task of balancing private compassion against clearly articulated public policy, and recognize[ ] that [our] conclusion is, in some respects, disturbing." *Id.* at 756.

> It goes without saying that statutes of limitations often make it impossible to enforce what were otherwise perfectly valid claims. But that is their very purpose, and they remain as ubiquitous as the statutory rights or other rights to which they are attached or are applicable.

*Kubrick* 444 U.S. at 125, 100 S.Ct. at 361.

The results in this case are troubling since we cannot alleviate the injury nor compensate for the hardships endured by Tony, Luis Sr., and Mrs. Martinez. We are bound, however, to strictly construe the law. The task of determining whether plaintiff acted in accordance with the "reasonably diligent person" standard is within the discretion of the district court judge, *see Nemmers*, 870 F.2d at 429. In light of the totality of proof presented in both trials, we find by a fair preponderance of the credible evidence that plaintiff's action is time-barred pursuant to Section 2401(b) of the FTCA.[18]

---

**18.** After the first trial, we found that "[n]o event

occurred from the time of birth to the time of

Accordingly, plaintiff's action is dismissed.

So Ordered.

See also 661 F.Supp. 62.

reading the newspaper article that would have stimulated a reasonable person in claimant's position to inquire further as to the true source of the injury." *Mendez by Martinez,* 655 F.Supp. at 707. We also recognized, however, that fuller factual development would be required in the second trial. Our present conclusion, necessarily amending the earlier finding, is based on the totality of evidence presented at both trials.